NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 22-5295

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs/Appellants*,

v.

NATIONAL MARINE FISHERIES SERVICE, et al.,
*Defendants/Appellees*.

_____

Appeal from the United States District Court for the District of Columbia
No. 1:21-cv-00930-BAH (Hon. Beryl A. Howell)

_____

**BRIEF FOR APPELLEES**

_____

<table>
<tr><td></td><td>TODD KIM</td></tr>
<tr><td></td><td>*Assistant Attorney General*</td></tr>
<tr><td></td><td>RACHEL HERON</td></tr>
<tr><td></td><td>ANDREW M. BERNIE</td></tr>
<tr><td>Of Counsel:</td><td>MARK A. BROWN</td></tr>
<tr><td></td><td>HANNAH O'KEEFE</td></tr>
<tr><td>SHEPHERD R. GRIMES</td><td>KEVIN W. McARDLE</td></tr>
<tr><td>*Attorney*</td><td>*Attorneys*</td></tr>
<tr><td>NATIONAL OCEANIC AND</td><td>Environment and Natural Resources Division</td></tr>
<tr><td>ATMOSPHERIC ADMINISTRATION</td><td>U.S. Department of Justice</td></tr>
<tr><td></td><td>Post Office Box 7415</td></tr>
<tr><td></td><td>Washington, D.C. 20044</td></tr>
<tr><td></td><td>Tele: (202) 305-0219</td></tr>
<tr><td></td><td>kevin.mcardle@usdoj.gov</td></tr>
</table>

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A.    Parties and Amici**

All parties, intervenors, and amici appearing before the district court and in this Court are listed in the Brief for Plaintiffs/Appellants.

**B.    Rulings Under Review**

References to the rulings at issue appear in the Brief for Plaintiffs/Appellants.

**C.    Related Cases**

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

/s/ *Kevin W. McArdle*
KEVIN W. McARDLE

Counsel for Defendants/Appellees

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ...........................................................................................i

TABLE OF AUTHORITIES ....................................................................iv

GLOSSARY ......................................................................................... viii

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION...........................................................2

STATEMENT OF THE ISSUES................................................................3

PERTINENT STATUTES AND REGULATIONS ....................................3

STATEMENT OF THE CASE...................................................................4

    A.    Statutory and regulatory background ...................................4

        1.    The Endangered Species Act ....................................4

        2.    The National Environmental Policy Act....................5

    B.    Factual background ...............................................................6

        1.    The proposed TED rule and draft EIS .......................9

        2.    Public comments on the proposed rule and draft
            EIS.............................................................................14

        3.    The final TED rule and EIS .....................................16

    C.    Proceedings below.................................................................21

SUMMARY OF ARGUMENT .................................................................23

STANDARD OF REVIEW .......................................................................25

ARGUMENT ...........................................................................................26

I.    The Service provided a rational justification for the final rule. ...................26

    A.    The changes from the proposed rule were reasonably based on both the safety/performance concerns *and* the economic concerns raised in the public comments. ...........................28

    B.    The Service reasonably accounted for the 2018 study on sea turtle bycatch in the otter trawl fleet. ..............................................34

II.   The final TED rule is a logical outgrowth of the proposed rule...................35

III.  The Service's analysis of the final rule's beneficial environmental effects complies with NEPA. .................................43

    A.    Plaintiffs forfeited their objection to the Service's analysis. ................................................................................44

    B.    The Service's approach complied with NEPA....................46

CONCLUSION .......................................................................................52

CERTIFICATE OF COMPLIANCE.......................................................53

ADDENDUM .........................................................................................54

# TABLE OF AUTHORITIES

## Cases

*American Wildlands v. Kempthorne,*
   530 F.3d 991 (D.C. Cir. 2008) ................................................................23

*Arizona Public Service Co. v. EPA,*
   211 F.3d 1280 (D.C. Cir. 2000) ................................................... 39, 40

*Association of American Railroads v. U.S. Department of Transportation,*
   38 F.3d 582 (D.C. Cir. 1994) ................................................................37

*Center for Biological Diversity v. FERC,*
   67 F.4th 1176 (D.C. Cir. 2023) ...............................................................6

*Chamber of Commerce v. SEC,*
   443 F.3d 890 (D.C. Cir. 2006) .................................................... 42, 43

*Chesapeake Climate Action Network v. EPA,*
   952 F.3d 310 (D.C. Cir. 2020) ..............................................................36

*CSX Transportation, Inc. v. Surface Transportation Board,*
   584 F.3d 1076 (D.C. Cir. 2009) ................................................... 39, 40

*Defenders of Wildlife v. U.S. Dep't of the Interior,*
   931 F.3d 339 (4th Cir. 2019) ................................................................51

*Department of Transportation v. Public Citizen,*
   541 U.S. 752 (2004) ..................................................................... 44, 45

*Epsilon Electronics, Inc. v. Department of Treasury,*
   857 F.3d 913 (D.C. Cir. 2017) ..............................................................35

*Ethyl Corp. v. EPA,*
   541 F.2d 1 (D.C. Cir. 1976) ....................................................... 25, 26, 28

*Florida Power & Light Co. v. United States,*
   846 F.2d 765 (D.C. Cir. 1988) ..............................................................42

*Gerber v. Norton*,
   294 F.3d 173 (D.C. Cir. 2002) ............................................................25

*Idaho Conservation League v. Wheeler*,
   930 F.3d 494 (D.C. Cir. 2019) ............................................................37

*In re Swine Flu Immunization Products Liability Litigation*,
   880 F.2d 1439 (D.C. Cir. 1989) ..........................................................45

*Indian River County v. U.S. Department of Transportation*,
   945 F.3d 515 (D.C. Cir. 2019) ............................................................47

*International Union, United Mine Workers of America v. Mine Safety
   and Health Admin.*, 626 F.3d 84 (D.C. Cir. 2010) ....................... 41, 43

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007) ...........................................................................36

*Louisiana v. Department of Commerce*,
   559 F. Supp. 3d 543 (E.D. La. 2021) ................................................20

*Louisiana v. National Oceanic and Atmospheric Administration*,
   No. 22-30799, 2023 WL 4014179 (5th Cir. June 15, 2023) ...............21

*Mayo v. Reynolds*,
   875 F.3d 11 (D.C. Cir. 2017) .............................................................47

*MD Pharmaceutical v. Drug Enforcement Administration*,
   133 F.3d 8 (D.C. Cir. 1998) ...............................................................31

*Michigan v. EPA*,
   576 U.S. 743 (2015) ..................................................................... 27, 29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
   463 U.S. 29 (1983) ....................................................................... 26, 42

*Nevada v. Department of Energy*,
   457 F.3d 78 (D.C. Cir. 2006) .............................................................44

*North America's Bldg. Trades Unions v. OSHA,*
   878 F.3d 271 (D.C. Cir. 2017) ................................................................35

*Northeast Mdaryland Waste Disposal Authority v. EPA,*
   358 F.3d 936 (D.C. Cir. 2004) .................................................... 34, 35

*NRDC v. U.S. Nuclear Regulatory Commission,*
   823 F.3d 641 (D.C. Cir. 2016) ................................................................46

*Omnipoint Corp. v. FCC,*
   78 F.3d 620 (D.C. Cir. 1996) ................................................................39

*Prime Time Intern. Co. v. Vilsack,*
   599 F.3d 678 (D.C. Cir. 2010) ................................................................46

*Public Service Commission v. FCC,*
   906 F.2d 713 (D.C. Cir. 1990) .................................................... 38, 39

*Sierra Club v. Costle,*
   657 F.2d 298 (D.C. Cir. 1981) ................................................................38

*Sierra Club v. FERC,*
   827 F.3d 36 (D.C. Cir. 2016) ........................................... 44, 45, 49

*Sierra Club v. FERC,*
   867 F.3d 1357 (D.C. Cir. 2017) ............................................................52

*Singleton v. Wulff,*
   428 U.S. 106, (1976) ................................................................................46

*United States Sugar Corp. v. EPA,*
   830 F.3d 579 (D.C. Cir. 2016) ........................................... 31, 32, 33

*Village of Bensenville v. FAA,*
   457 F.3d 52 (D.C. Cir. 2006) ................................................................26

*White v. U.S. Department of the Army,*
   720 F.2d 209 (D.C. Cir. 1983) ................................................................46

## Statutes

5 U.S.C. § 553 ................................................................................36

5 U.S.C. § 706 ........................................................................... 25, 41

16 U.S.C. § 1532 ..............................................................................4

16 U.S.C. § 1533 ......................................................................... 4, 27

16 U.S.C. § 1536 ..............................................................................5

16 U.S.C. § 1538 ..............................................................................4

16 U.S.C. § 1539 ..............................................................................9

16 U.S.C. § 1540 ......................................................................... 4, 27

28 U.S.C. § 1331 ..............................................................................2

42 U.S.C. § 4332 ..............................................................................5

## Regulations

40 C.F.R. 1502.14 ..........................................................................49

40 C.F.R. § 1508.27 ........................................................................50

40 C.F.R. § 1508.8 ...................................................................... 5, 46

50 C.F.R. § 222.101(a) ..................................................................4, 7

50 C.F.R. § 222.102 ......................................................................6, 7

50 C.F.R. § 223.206 ..........................................................................9

50 C.F.R. § 402.02 ..........................................................................50

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy At |
| TED | Turtle Excluder Device |
| The Service | National Marine Fisheries Service |

## INTRODUCTION

Plaintiffs challenge a rule issued by the National Marine Fisheries Service (Service) that requires certain skimmer trawl vessels in the southeastern U.S. shrimp fisheries to use turtle excluder devices (TEDs).  TEDs allow sea turtles caught in shrimp trawl nets to escape.  The Service issued the rule under the Endangered Species Act (ESA) to aid in the conservation of several species of sea turtles listed as threatened or endangered.  Prior to the challenged rule, skimmer trawl vessels were exempt from TED requirements.  The final rule expands the scope of those requirements for the benefit of listed sea turtles.

Despite the rule's conservation benefits, Plaintiffs contend that the rule does not go far enough to protect listed sea turtles.  But Plaintiffs do not claim that the rule violates any provision of the ESA.  Nor do Plaintiffs argue that, in drawing the line where it did, the Service relied on improper legal considerations.  Plaintiffs instead contend that the Service did not adequately explain its decision to expand the required use of TEDs only to skimmer trawl vessels 40 feet or longer when the proposed rule would have gone further.  Plaintiffs also argue that the final rule violates the Administrative Procedure Act (APA) because it is not a logical outgrowth of the proposed rule.  And Plaintiffs contend that the Service violated the National Environmental Policy Act (NEPA) by failing to conduct a species-by-species analysis of the rule's beneficial effects on listed sea turtles.

The district court properly rejected Plaintiffs' claims.  The Service plainly articulated a rational basis for the final rule:  it achieves a significant conservation benefit for listed sea turtles while substantially reducing the economic impacts in comparison to the proposed rule.  And Plaintiffs do not dispute that the Service had discretion to weigh economic impacts in deciding how far to extend the TED requirements.  The final rule is also a logical outgrowth of the proposed rule because it expands the required use of TEDs to a subset of the vessels covered by the proposal, and because the changes in the final rule reasonably responded to concerns about the scope of the proposed rule raised in public comments.  Finally, as Plaintiffs' own comments demonstrate, the Service's analysis of the rule's beneficial environmental effects complied with NEPA by facilitating a meaningful comparison of alternatives and informed agency decision-making.

The district court's judgment should be affirmed.

## STATEMENT OF JURISDICTION

(A)    The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under the APA, 5 U.S.C. §§ 701 et seq., and NEPA, 42 U.S.C. §§ 4321 et seq.  [ECF 1].

(B)    This Court has jurisdiction under 28 U.S.C. § 1291 because the district court entered a final judgment.  [ECF 34].

(C)    That judgment was entered on September 14, 2022.  *Id*.  Plaintiffs

filed their notice of appeal on November 14, 2022, or 61 days later.  [ECF 36].

The appeal is timely.  *See* Fed. R. App. P. 4(a)(1)(B); Fed. R. App. P. 26(a)(1)(C).

(D)    The appeal is from a final judgment that disposes of all claims.

## STATEMENT OF THE ISSUES

1.    Whether the Service articulated a rational basis for the final rule by

explaining that the rule achieves a significant conservation benefit for listed sea

turtles while substantially reducing the economic impacts on shrimp trawlers in

comparison to the proposed rule.

2.    Whether the final rule is a logical outgrowth of the proposed rule, in

compliance with the APA's notice requirements, because the final rule expands the

required use of TEDs to a subset of vessels covered by the proposed rule.

3.    Whether the Service's analysis of the final rule's beneficial

environmental effects complied with NEPA by allowing for a meaningful

comparison of alternatives and informed decision-making.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations not included in the Addendum to the

Brief of Plaintiffs/Appellants are set forth in the attached Addendum.

## STATEMENT OF THE CASE

**A.    Statutory and regulatory background**

**1.    The Endangered Species Act**

The ESA provides for the listing of species as threatened and endangered. *See* 16 U.S.C. § 1533. The Secretary of the Interior and the Secretary of Commerce share responsibility for administering the ESA. The Secretary of Commerce (Secretary) is generally responsible for listed marine species, including the listed sea turtle species at issue here when they are present in the marine environment. The Secretary has delegated that responsibility to the Service, a component of the National Oceanic and Atmospheric Administration within the Department of Commerce. *See* 50 C.F.R. § 222.101(a).

The ESA affords a range of protections to listed species. As relevant here, Section 9 makes it unlawful to "take" members of an endangered species. 16 U.S.C. § 1538(a)(1)(B); *see also id*. § 1532(19) (defining "take"). Under Section 4(d), the Secretary may issue regulations extending the Section 9 prohibitions to a threatened species, and such other regulations as she "deems necessary and advisable to provide for the conservation of such species." *Id*. § 1533(d). Section 11(f) also authorizes the Secretary to "promulgate such regulations as may be appropriate to enforce" the Act. *Id*. § 1540(f).

Section 7(a)(2) of the ESA directs each federal agency, in consultation with (in this case) the Service, to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Where (as here) the Service is both the action agency and the consulting agency, the Service conducts an internal consultation and issues a biological opinion addressing whether its proposed action is likely to cause jeopardy. [AR11037, 44].

If the Service concludes that the proposed action is not likely to cause jeopardy but will incidentally take listed species, the Service provides an incidental take statement with its biological opinion. *See* 16 U.S.C. § 1536(b)(4). Any taking in compliance with the terms and conditions of the incidental take statement is exempt from the Section 9 take prohibition. *See id*. § 1536(o).

### 2.    The National Environmental Policy Act

NEPA directs federal agencies to prepare an "environmental impact statement" (EIS) for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An EIS must include a "detailed statement" concerning "the environmental impact of the proposed action" and "alternatives to the proposed action." *Id*. § 4332(C)(i), (iii). "Effects and impacts" under NEPA include ecological effects as well as economic and social effects. 40 C.F.R. § 1508.8. "Effects may also include those resulting from

actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial." *Id*.[1]  Because NEPA is "a purely procedural statute," an agency "enjoys latitude when preparing an EIS." *Center for Biological Diversity v. FERC*, 67 F.4th 1176, 1181 (D.C. Cir. 2023).

### B.    Factual background

At issue in this case is the interaction between the southeastern U.S shrimp fisheries and ESA-listed sea turtles.  The fisheries operate off the coast of the United States from North Carolina to Texas.  [AR1688, 2157].  Participants use "trawl" nets, which are funnel-shaped nets towed or pushed through the water. [AR2003].  Large commercial trawlers operating in offshore waters primarily use "otter" trawls.  An otter trawl is a large net bag with boards at each side that hold the net open as it is towed through the water.  [AR1669, AR1683, AR1794].

Most smaller vessels operating in nearshore waters use "skimmer" trawls.  A skimmer trawl is towed alongside the vessel and held open by a frame that keeps the net higher in the water column, with the top elevated above the water's surface to prevent shrimp from jumping over the net.  [AR2155-56]; 50 C.F.R. § 222.102.

---

[1] NEPA regulations, which are promulgated by the Council on Environmental Quality (the executive body charged with interpreting NEPA), were amended effective September 14, 2020.  *See* 85 Fed. Reg. 43,304 (July 16, 2020).  This brief refers to the 2019 version of regulations in effect in when the challenged rule was promulgated.  NEPA was also recently amended by the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, § 321, 137 Stat. 10, 38-46 (2023), but the amendments are not germane to this dispute.

Vessels targeting shrimp in nearshore waters may also use a "pusher-head" trawl, which is a V-shaped net mounted on the bow of the boat, or "wing nets," which are mounted on the sides of the vessel or on a stationary platform and held open by a rigid frame. [AR1883-85, 2156]; 50 C.F.R. § 222.102. But skimmer trawls—the gear type at issue in this case—account for 90 percent of non-otter trawl shrimp landings in the southeastern U.S. shrimp fisheries. [AR1810].

In the Gulf of Mexico, skimmer trawls are used off the coasts of Louisiana, Mississippi, Alabama, and (to a lesser extent) Florida. [AR1668, 1685, 1687-88]. Florida skimmer trawl vessels are not at issue here because Florida law already requires all trawls to use TEDs while fishing in Florida state waters, and due to operational constraints, skimmer trawls do not operate in federal waters off the coast of Florida. [AR1668, 1795]. In the South Atlantic, North Carolina is the only state that permits the use of skimmer trawl gear. [AR1685].

Five ESA-listed sea turtle species occur in waters where the southeastern U.S. shrimp fisheries operate: Kemp's ridley, loggerhead, leatherback, green, and hawksbill sea turtles. Loggerhead and green sea turtles are threatened, and the remaining three species are endangered. *See* 50 C.F.R. §§ 223.102(e), 224.101(h). Since 1987, Service regulations promulgated under Sections 4(d) and 11(f) of the ESA have required shrimp trawlers to use TEDs in certain circumstances to reduce incidental take of listed sea turtles. *See* [AR1684]. As shown below, a TED is a

7

grid installed in a trawl net that mechanically separates sea turtles, which are then excluded from the net through an escape opening ([AR1659]):



Otter trawl vessels have long been required to use TEDs. [AR9460]. But the Service's regulations have consistently given vessels operating in nearshore waters (including all vessels using skimmer trawls, pusher-head trawls, and wing nets) the option of adhering to tow time restrictions in lieu of installing TEDs. [AR2154-55]. Though not as effective as TEDs, tow time restrictions aim to reduce sea turtle take by limiting the time a vessel may keep its nets in the water and by requiring the nets to be raised out of the water and inspected for captured turtles. *See* [ECF 35 at 14]. The Service made this option available to vessels

8

using skimmer trawls, pusher-head trawls, and wing nets because those gear types were thought to be less of a threat to sea turtles than otter trawls.  [AR1658].

Incidental takes of listed sea turtles during shrimp trawling operations are exempt from the ESA Section 9 take prohibition so long as the operations comply with the Service's sea turtle conservation regulations, *see* 50 C.F.R. §§ 223.206(d), 224.104(a), and with the terms and conditions of any applicable biological opinion issued under ESA Section 7 or incidental take permit issued under ESA Section 10, *see* 16 U.S.C. § 1539(a)(1)(B); *see also* [AR2154, 9456].

### 1.    The proposed TED rule and draft EIS

In 2016, the Service proposed to amend its sea turtle conservation regulations to withdraw the alternative tow-time restriction and to expand the required use of TEDs to all skimmer trawls, pusher-head trawls, and wing-nets operating in the southeastern U.S. shrimp fisheries.  [AR2154].[2]  The Service explained that the purpose of the proposed rule was to "reduce incidental bycatch and mortality of sea turtles in the southeastern U.S. shrimp fisheries, and to aid in the protection and recovery of listed sea turtle populations."  *Id*.

The Service's proposal was driven by several factors.  New information indicated an increasing abundance of small, juvenile sea turtles (particularly

---

[2] The proposal was subject to a geographic exception for the wing net fishery in Florida's Biscayne Bay, [AR9456], which is not relevant here.

9

endangered Kemp's ridleys) in the shallow, coastal waters where skimmer trawls operate.  [AR1306, 1309, 1659].  The available data also indicated that a significant portion of the juvenile sea turtles observed in shallow, coastal waters were small enough to pass through the bars of then-authorized TEDs.  [AR1659]. In addition, new analyses suggested that tow time restrictions might not be as effective at minimizing sea turtle bycatch and mortality as originally thought.  *Id*. Those factors, in conjunction with the large number of vessels participating in the southeastern U.S. shrimp fisheries, led to concerns that fishery operations could result in elevated sea turtle bycatch.  *Id*.  The Service thus began exploring new TED designs and management alternatives to reduce sea turtle bycatch and mortality.  [AR1305, 1309, 1659, 2155].

In the draft EIS accompanying the proposed rule, the Service analyzed seven management alternatives, including a no-action alternative that would maintain the status quo.  [AR1298-1300, 1508].  All six action alternatives called for expanding the required use of TEDs (newly designed to exclude small sea turtles) to "various types and/or size shrimp trawlers to reduce the incidental bycatch and mortality of small sea turtles in the shrimp fisheries."  [AR1508].

In addition to the preferred alternative (Alternative 3) described in the proposed rule, which would have expanded the required use of TEDs to all skimmer trawls, pusher-head trawls, and wing nets, the action alternatives called

10

for (among other options) expanding the required use of TEDs to: vessels 26 feet or longer using skimmer trawls, pusher-head trawls, and wing nets (Alternative 2); vessels 26 feet or longer using skimmer trawls (Alternative 4); and all vessels using skimmer trawls, regardless of length (Alternative 5). [AR1298-99]. The 26-foot length threshold for Alternatives 2 and 4 was based on the lack of TED testing and observer data for smaller vessels. [AR1312]. The 26-foot threshold also was based on concerns raised during the public scoping process about the safety of using TEDs on smaller vessels. [AR1312-13]. Small vessels are often operated by a single individual and have limited deck space, which increases the risk of harm to the operator if, for example, the TED becomes clogged with debris or the net (lengthened to accommodate the TED) becomes entangled. *Id.*

The draft EIS indicated that each action alternative would have three primary effects: (1) a conservation benefit, in the form of reduced annual sea turtle mortalities in comparison to the status quo; (2) adverse economic effects on industry, which the draft EIS described in terms of the number of vessels affected, lost revenue (because of shrimp loss associated with TED use), and increased TED costs; and (3) an increased need for TEDs, along with the associated manufacturing time needed to meet the increased demand. *See* [AR1300, 1489, 1508, 2157].

For each action alternative, the Service calculated the aggregate number of sea turtle mortalities that would be avoided each year, [AR1508], and separately

presented the numbers for the Gulf of Mexico and South Atlantic (North Carolina) fisheries, [AR1433, 1436].  Those estimates were based on observer data gathered on skimmer trawl vessels.  [AR1308, 1427-30, 2156].  The draft EIS indicated that approximately 97 percent of the sea turtles conserved under each alternative would occur in Gulf of Mexico waters.  *See* [AR1433, 1436].  In North Carolina, otter trawls harvest the bulk of landed shrimp, with skimmer trawls accounting for only three percent of the total catch.  [AR1352].

The Service estimated that, under the no-action alternative representing the status quo, 5,837 non-otter trawl vessels participating in the southeastern U.S. shrimp fisheries cause 2,165-2,942 sea turtle mortalities annually.  [AR1300].  The preferred alternative (Alternative 3) would avoid 1,730-2,500 annual mortalities.  *Id*.  Although shrimp trawlers may incidentally take any of the five potentially affected sea turtle species, the draft EIS predicted that roughly 80 percent of the conserved sea turtles likely would be Kemp's ridleys and the remaining 20 percent would be green sea turtles.  [AR1531-32].

The draft EIS explained that Kemp's ridleys utilize the Gulf of Mexico as their primary habitat for most life stages, including all nesting and mating. [AR1518].  Both Kemp's ridley and green sea turtles are becoming more common in the shallow, nearshore waters of the Gulf of Mexico, and the skimmer trawl fisheries have been documented to interact with both species.  [AR1307].

Although the Gulf of Mexico observer data has documented a few interactions between skimmer trawl vessels and loggerheads, most interactions have involved Kemp's ridley or green sea turtles. [AR10783, 10793, 10814, 10845-46, 10855-56]; *see also* [AR1427, 11194].  Loggerhead nesting primarily occurs on the Atlantic coast; hawksbill sea turtles do not typically utilize the northern Gulf of Mexico in large numbers; and leatherbacks rarely nest along the Gulf coast, primarily utilizing offshore waters.  [AR1519].

Regarding economic impacts, the Service estimated that Alternative 3 would affect 5,837 vessels, impose $13.7 million in costs on industry in the first year, and cause approximately 48 percent of affected part-time vessels that are already operating on small economic margins to cease operations.  [AR1508]; *see also* [AR1478, 1488-89, 2157-58].  The preferred alternative would also require 23,266 new TEDs that would take 4.3 years to manufacture.  [AR1508].

In its proposed rule, the Service summarized the action alternatives that were analyzed in the draft EIS, again focusing on the overall number of annual sea turtle mortalities that would be avoided and the economic impacts on industry. [AR2159-60].  The proposed rule also discussed the possibility of phasing in any new TED requirements, given the number of new TEDs that would be needed and the associated manufacturing time.  [AR2156].  The intent of a phased-in approach, the Service explained, would be "to first implement the requirement where it

13

would achieve the greatest conservation benefit for listed sea turtles."  [AR2156].

One option highlighted for public comment was to phase in the requirements

"based on vessel size, where the largest vessels would be the first vessels required

to install the devices."  *Id*.  The Service explained that vessel size would serve "as

a proxy for effort and the associated sea turtle interactions"—in other words,

targeting larger vessels would be expected to have a greater beneficial effect on sea

turtles than targeting smaller vessels.  *See id*.

### 2.    Public comments on the proposed rule and draft EIS

The proposed rule and draft EIS were simultaneously made available for

public comment.  [AR2050].  The Service received approximately 38,500 written

comments contained in 1,200 distinct submissions.  *Id*.  The Service also

conducted six public hearings and two additional presentations throughout the

northern Gulf of Mexico coastal States and in coastal North Carolina.  *Id*.

Many comments raised concerns about the safety and practicality of using

TEDs on smaller skimmer trawl vessels, as would be required under the proposed

rule.  [AR9434-35, 9464]; *see also, e.g*., [AR3156, 3602, 4052-53, 4055-56, 8610

8617].  These comments expanded on the safety concerns raised during the public

scoping process, noting for example that "in rough seas, the [TED] grate would

swing and have the potential to either injure someone on the vessel or knock

someone overboard."  [AR4056].  One individual suggested at a public hearing

that the Service should exempt from any new TED requirements all skimmer trawl vessels less than 40 feet in length. [AR9466]. Concerns were also raised about extending TED requirements to pusher-head trawls and wing nets, given the lack of data on TED use in those gear types. [AR9434-35].

Other comments raised concerns about the economic impact of extending TED requirements to vessel owners who were already operating on small economic margins. [AR1865, 9458-60]. The Louisiana Shrimp Association, for example, stated that any of the six action alternatives would "have a devastating adverse economic impact on families that have traditionally harvested shrimp from coastal Louisiana waters." [AR2195]; *see also* [AR2189, 3155, 3218-19, 3638, 3682, 3853, 8549, 8597].

Commenters also questioned the need to expand TED requirements at all, citing improvements in sea turtle nesting numbers. [AR2060, 2192, 3156-57, 9458-59, 8549, 9461-62]. Commenters stated that existing tow time restrictions were sufficient, "as evidenced by the growing number of Kemp's ridley nests," [AR9458], and accused the Service of "grossly overestimat[ing] sea turtle mortality attributable to the skimmer trawl fisheries," [AR9463].

Plaintiffs submitted detailed comments advocating for the adoption of Alternative 3 based on the Service's finding that it would "prevent an estimated 1,730-2,500 sea turtle mortalities each year." [AR3526]. Plaintiffs did not object

to the Service's discussion of the conservation benefits of each alternative in terms of the overall number of annual sea turtle mortalities that would be avoided. [AR3525-35, 7642-48].  Plaintiffs also did not assert that NEPA required a species-by-species analysis of conservation benefits, or that the absence of such an analysis precluded a meaningful comparison of alternatives.  *See id*.

### 3.    The final TED rule and EIS

In response to the public comments "regarding potential negative economic effects of the proposed rule and questioning the need for additional sea turtle conservation measures," the Service "explored additional alternatives that would focus conservation requirements on larger, full-time vessels that would be expected to encounter sea turtles on the fishing grounds more frequently than smaller, part-time vessels."  [AR1674].  As a result of that effort, the Service developed a revised preferred alternative (Alternative 8) for analysis in the final EIS.  *Id*.

Alternative 8 called for expanding the required use of TEDs to skimmer trawl vessels 40 feet or longer.  [AR1661].  Alternative 8 is therefore identical to Alternative 4, except that Alternative 8 uses a delineation point of 40 feet rather than 26 feet.  [AR1660-61].  The Service explained that most skimmer trawl, pusher-head trawl, and wing net vessels are part-time vessels that do not fish as often as full-time vessels.  The sea turtle mortality rate would be expected to be significantly higher among full-time vessels, "many of which are 40 feet and

greater in length." [AR2062]. The Service further explained that the lack of observer or testing data and the "need to further explore efficacy and safety issues related to TED use on pusher-head trawls and wing nets, as well as small skimmer trawl vessels," led the agency to exclude those vessels from the scope of Alternative 8. [AR2050, 2060, 2061-62]; *see also* [AR1674].

Using the same methodology described in the draft EIS, the Service estimated that Alternative 8 would yield a significant conservation benefit by avoiding 801-1,158 sea turtle mortalities annually in comparison to the status quo, [AR1894], with 97 percent of the conserved sea turtles occurring in Gulf of Mexico waters, [AR1811].[3] The Service explained that most of the expected benefits would result from reduced mortalities to Kemp's ridley sea turtles and, to a lesser extent, green sea turtles. [AR1936]. As with Alternative 3, the Service estimated that roughly 80 percent of the conserved sea turtles would be Kemp's ridleys and 20 percent would be green sea turtles. [AR1918].

Alternative 8 significantly reduced the number of vessels affected and the adverse economic impacts in comparison to Alternative 3, while still achieving significant conservation benefits compared to the longstanding status quo. *See*

---

[3] The response to comments in the final EIS and final rule incorrectly references 1,1**6**8 as the upper limit of the range of sea turtles that would be conserved annually under Alternative 8. [AR2052, 2069, 9457]. The correct number is 1,1**5**8, as explained elsewhere in the final EIS. [AR1810].

[AR1894].  The Service estimated that Alternative 8 would affect 1,062 vessels, whereas Alternative 3 affected 5,837 vessels.  *Id*.  Alternative 8 would impose $3.7 million in costs in the first year, whereas Alternative 3 would impose $13.7 million in costs.  *Id*.  Alternative 8 would cause 180 part-time vessels to shut down, whereas Alternative 3 could cause 2,810 vessels to shut down.  [AR1865].  In addition, Alternative 8 could be implemented much more quickly than Alternative 3 because Alternative 8 required 4,242 new TEDs that would take 10 months to manufacture, whereas Alternative 3 required 23,266 new TEDs that would require 4.3 years to manufacture.  [AR1894].  The Service concluded that Alternative 8 did not require preparation of a new draft EIS because the environmental impacts fell within the range of impacts analyzed in the existing draft.  [AR1662, 1673].

In 2019, pursuant to its authority under Sections 4(d) and 11(f) of the ESA, the Service issued a final rule adopting Alternative 8 and expanding the required use of TEDs to skimmer trawl vessels 40 feet or longer.  [AR9456-72].  The Service explained that the final rule "will achieve a significant conservation benefit for listed sea turtles, while affecting significantly fewer vessels and imposing far fewer costs upon industry" than the proposed rule.  [AR9457].  And because fewer TEDs need to be manufactured to supply the vessels covered by the final rule, it could "be implemented in far less time than the proposed rule, allowing for more focused and expedient sea turtle conservation."  *Id*.

18

The Service explained that the changes from the proposed rule were based on the public comments "raising performance and safety issues with TED use on smaller vessels and regarding the economic impacts of the proposed rule, and new information indicating significantly lower levels of sea turtle mortality in the offshore fleet." [AR9457]. The Service expanded on the last point in response to public comments. Certain commenters asserted that the available data did not justify extending TED requirements to *any* skimmer trawl vessels. *See* [AR9462]. The Service disagreed and stated that the available information "warrants measures to reduce sea turtle bycatch and mortality in the skimmer trawl fisheries." *Id*. After discussing observer data and other information, the Service explained that a new 2018 study indicated that sea turtle bycatch in the offshore otter trawl fleet was significantly lower than previously estimated, which "further supports the need for sea turtle conservation in the skimmer trawl fisheries." *Id*. That is because, even though the study indicates that the overall level of sea turtle bycatch in the shrimp trawl fisheries may be less than previously thought, it also indicates that skimmer trawl vessels are responsible for a greater proportional share of the bycatch despite less overall fishing effort, *see* [AR9436].

The Service also explained that, based on the lack of TED testing data for pusher-head trawls and wing nets, the agency had decided to maintain the alternative tow-time restrictions for those gear types. [AR9457]. Skimmer trawl

vessels under 40 feet also remain subject to the tow-time restrictions. *Id*. The Service revised and clarified those restrictions to avoid potential safety and performance issues on smaller vessels "while allowing for a more complete inspection of the net for captured sea turtles." *Id*.; *see also* [AR9464].

The Service set April 1, 2021, as the effective date for the new rule "to allow for the manufacture of the necessary number of TEDs and for fishers, particularly lower income fishers, to financially prepare for the regulation." [AR9457, 9465]. The effective date was delayed until August 1, 2021, because pandemic-related restrictions limited the Service's ability to conduct planned outreach and training. [AR11034-35]; *see also* [AR9466]. For "Louisiana inshore waters," the effective date was further delayed until February 1, 2022, after the State of Louisiana secured a preliminary injunction postponing the effective date "to allow appropriate time for all shrimpers to come into compliance." *Louisiana v. Department of Commerce*, 559 F. Supp. 3d 543 (E.D. La. 2021).[4]

---

[4] Louisiana brought a separate suit against the Service alleging that the final rule goes too far, and that no valid basis exists for requiring TEDs on any skimmer trawls operating in Louisiana waters. After issuing the preliminary injunction delaying the final rule's effective date, the district court held that the State lacked Article III standing to pursue its claims and entered summary judgment for the Service on that basis. *See* 2022 WL 17251152 (E.D. La. Nov. 28, 2022). The Fifth Circuit recently affirmed. *See Louisiana v. Nat'l Oceanic and Atmospheric Admin.*, No. 22-30799, 2023 WL 4014179 (5th Cir. June 15, 2023).

In April 2021, before the final TED rule took effect, the Service issued a biological opinion under Section 7 of the ESA concluding that the amended sea turtle conservation regulations, and the Service's separate authorization of the southeastern U.S. shrimp fisheries in federal waters under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1884, are not likely to jeopardize the continued existence of any listed sea turtle species. [AR11037-51, 11216-38].  The biological opinion includes an incidental take statement covering the anticipated take of listed sea turtles in the southeastern U.S. shrimp fisheries.  [AR11259-66].

### C.    Proceedings below

Plaintiffs sued the Service in April 2021 challenging the final TED rule and alleging violations of the APA and NEPA.  [ECF 1].  The parties cross-moved for summary judgment, and in September 2022, the district court entered summary judgment for the Service.  [ECF 34-35].

The court first held that the Service provided a rational basis for its decision to expand the required use of TEDs only to skimmer trawl vessels 40 feet or longer.  [ECF 35 at 25-33].  The court held that the agency's decision was reasonably based on the documented performance and safety concerns relating to the use of TEDs on smaller vessels, public comments expressing concerns about the economic impacts of the proposed rule, and a lack of data justifying the

extension of TED requirements to pusher-head trawls and wing nets.  [ECF 35 at 28-33].  The court further held that the Service reasonably limited the required use of TEDs to skimmer trawl vessels 40 feet or longer to target full-time vessels that, on average, were responsible for a greater percentage of sea turtle mortalities than smaller, part-time vessels.  [ECF 35 at 32].

The district court next held the final rule was a logical outgrowth of the proposed rule because the final rule fell within the range of alternatives discussed in the proposed rule and draft EIS.  [ECF 35 at 33-36].  The court further explained that, because two of the alternatives discussed in the proposed rule linked TED requirements to vessel length, interested parties were on notice that the Service "was considering defining the class of vessels required to use TEDs based on vessel length."  [ECF 35 at 35].  The court added that the final rule was the product of meaningful public participation because it addressed the safety, feasibility, and economic concerns raised in the public comments.  [ECF 35 at 36].

Finally, the court held that the Service's analysis of the final rule's environmental impacts complied with NEPA.  [ECF 35 at 36-40].  The court rejected Plaintiffs' claim that NEPA mandates a species-by-species analysis of the rule's beneficial effects on listed sea turtles.  [ECF 35 at 38-39].  The EIS reasonably provided the overall number of annual sea turtle mortalities that would be avoided under each alternative, the court explained, and the EIS put those

numbers in context by providing detailed information on each species' range, population trends, and other specific characteristics.  [ECF 35 at 38].[5]

The district court entered judgment on September 14, 2022.  [ECF 34].  This appeal followed.

## SUMMARY OF ARGUMENT

1.    The Service rationally explained its decision to expand the required use of TEDs only to skimmer trawl vessels 40 feet or longer:  the decision achieves a significant conservation benefit for listed sea turtles while substantially reducing the economic impacts in comparison to the proposed rule.  The changes from the proposed rule, which would have required the use of TEDs on all skimmer trawl vessels, were reasonably based on public comments expressing safety and performance concerns about the use of TEDs on smaller vessels *and* concerns about the economic impacts of the proposed rule.  Both concerns are well documented in the record and collectively support the Service's final decision. The agency also reasonably accounted for the 2018 study showing reduced sea turtle bycatch in the offshore otter trawl fleet, which supports efforts to reduce sea

---

[5] Plaintiffs unsuccessfully pursued other claims at summary judgment, *see* [ECF 35 at 26-40], but have abandoned those claims by not pursuing them in their opening brief, *see Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (issues not raised in argument section of opening brief are forfeited on appeal).

turtle bycatch in the nearshore skimmer trawl fleet without dictating what additional measures may be necessary and advisable.

2.     The final rule is a logical outgrowth of the proposed rule because the final rule expands the required use of TEDs relative to the status quo to a subset of skimmer trawl vessels covered by the proposal.  The final rule did not "exempt" a moderate-length skimmer trawl vessel "category" from TED requirements, as Plaintiffs erroneously suggest, because no such category exists, and because *no* skimmer trawl vessels were required to use TEDs before the rule was issued.  The proposed rule also put interested parties on notice that the Service was considering management options based on vessel length, and the changes in the final rule were a direct response to public comments on the proposed rule.  Plaintiffs also were not prejudiced by the lack of a second comment period because their comments already made clear that they opposed anything less than a rule requiring the use of TEDs on all skimmer trawls, and because Plaintiffs cite no new evidence they would have submitted that the Service might have found convincing.

3.     The Service's analysis of the beneficial effects of each action alternative complied with NEPA.  Plaintiffs forfeited their objections by failing to raise them during the administrative process, and the objections lack merit in any event.  The Service estimated the annual sea turtle mortalities that would be avoided under each alternative, disclosed that most of the conserved sea turtles

would be Kemp's ridley or green sea turtles in the nearshore Gulf of Mexico waters, and provided additional species-specific information that further put the anticipated conservation benefits in context. As Plaintiffs' own comments indicate, the Service's analysis complied with NEPA by allowing for a meaningful comparison of alternatives and informed agency decision-making.

The district court's judgment should be affirmed.

## STANDARD OF REVIEW

The Court reviews the district court's grant of summary judgment to the Service de novo, "as if the agency's decision had been appealed to this [C]ourt directly." *Gerber v. Norton*, 294 F.3d 173, 178 (D.C. Cir. 2002) (internal quotation marks omitted). The Court reviews the final rule under the APA, which authorizes a reviewing court to set aside agency action only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard of review is a highly deferential one. It presumes agency action to be valid." *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976). An agency acts arbitrarily or capriciously only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43

(1983). Plaintiffs bear the burden of showing that the challenged rule is arbitrary

or capricious. *Village of Bensenville v. FAA*, 457 F.3d 52, 70-71 (D.C. Cir. 2006).

As demonstrated below, Plaintiffs have not met their burden.

## ARGUMENT

## I.     The Service provided a rational justification for the final rule.

The APA "requires affirmance if a rational basis exists for the agency's

decision." *Ethyl Corp*., 541 F.2d at 34. The Service articulated a rational basis for

its decision to expand the required use of TEDs to skimmer trawl vessels 40 feet or

longer:  the decision "achieve[s] a significant conservation benefit for listed sea

turtles, while affecting significantly fewer vessels and imposing far fewer costs

upon industry" than the proposed rule. [AR9457].

Plaintiffs' challenge to the Service's decision is narrow. Plaintiffs do not

claim that the agency violated any provision of the ESA in drawing the line where

it did. In accordance with Section 7, the Service concluded that its authorization of

the shrimp fisheries under the final TED rule is not likely to jeopardize any listed

sea turtle species. [AR11037-51, 11216-38]. Plaintiffs do not challenge that

conclusion or the Service's compliance with Section 7. Nor do Plaintiffs allege

that the Service violated Section 4(d) or 11(f) of the ESA by considering economic

impacts in deciding how far to expand the required use of TEDs. Section 4(d)

directs the Secretary to issue such regulations as she "deems necessary and advisable to provide for the conservation" of a threatened species. 16 U.S.C. § 1533(d). Section 11(f) authorizes the Secretary to promulgate "such regulations as may be appropriate" to enforce the ESA. *Id*. § 1540(f). Both broad grants of authority vest the Secretary with ample discretion to consider economic impacts in fashioning appropriate regulations. *See Michigan v. EPA*, 576 U.S. 743, 752 (2015) (noting the "capaciousness" of the phrase "appropriate and necessary" in the Clean Air Act's grant of regulatory authority to EPA, and stating that "appropriate" is "the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors") (internal quotation marks omitted). Plaintiffs also do not challenge the Service's finding that its final rule significantly reduces economic impacts in comparison to the proposed rule. [AR9457]. And Plaintiffs do not contest the Service's decision to exclude pusher-head trawls and wing nets from the new TED requirements because of the lack of data relating to TED use on those gear types. [AR9434-35].

Plaintiffs instead argue that the final rule is arbitrary and capricious because: (1) the cited safety and performance concerns apply only to vessels under 26 feet; and (2) the 2018 study showing lower-than-expected sea turtle mortalities in the offshore otter trawl fleet underscores the need to expand TED requirements to all skimmer trawl vessels. Opening Br. 20-31. Both arguments lack merit.

27

A.    **The changes from the proposed rule were reasonably based on both the safety/performance concerns *and* the economic concerns raised in the public comments.**

Although the proposed rule would have expanded the required use of TEDs to all skimmer trawl vessels, the final rule extends the requirement only to vessels 40 feet or longer.  One reason the Service cited for the change was the public comments raising safety and performance concerns about TED use on smaller vessels.  [AR9457].  Because those concerns are well documented in the record, *see, e.g.*, Opening Br. 22-25 (citing some relevant portions of the record), the concerns are neither "unsupported," *id*. at 20, nor "infirm," *id*. at 21.  Plaintiffs nevertheless argue that, because "the cited concerns apply only to small skimmer trawl vessels under 26 feet," *id*. at 22, they do not justify exempting skimmer trawl vessels between 26 and 40 feet from the new requirements, *id*. at 22-27.  This argument fails for two independent reasons.

*First*, the comments raising safety and performance concerns were not solely from owners or operators of vessels under 26 feet.  For example, the Aubudon Nature Institute submitted comments reporting the results of multiple industry workshops on the proposed rule.  One workshop was attended by 17 fishermen, all of whom had "boats that were greater than 26 feet," [AR4052], and "there was serious concern from all present about the safety of carrying TEDs," [AR4053].  A second workshop was attended by 38 fishermen, 27 of whom "fish in vessels

greater than 26 feet." [AR4055]. "All thirty-eight fisherman were very concerned about the size of the approved TED and the safety hazard it would cause on skimmer vessels. There was concern that in rough seas, the grate would swing and have the potential to either injure someone on the vessel or knock someone overboard." [AR4056]. All 38 fishermen favored a "more in depth analysis of the safety concerns on a skimmer vessel." *Id.* Those comments provide ample support for the Service's conclusion that "there is a need to further explore efficacy and safety issues related to TED use on … small skimmer trawl vessels," [AR9457], and that the need was not necessarily limited to vessels under 26 feet.

*Second*, regardless of the extent to which the documented safety and performance concerns apply to vessels between 26 and 40 feet, the Service did not state those concerns *alone* justified the change from the proposed rule. The Service instead stated that the change was based "on public comment raising performance and safety issues with TED use on smaller vessels *and* regarding the economic impacts of the proposed rule." [AR9457] (emphasis added). The Service developed and approved Alternative 8 because it addressed both key issues raised in the public comments, not just one of them, while still achieving a significant conservation benefit for listed sea turtles, [AR1674, 9457, 9470].

Indeed, the need to better address both issues led the Service to reject Alternative 4, which would have imposed the new TED requirements on all

skimmer trawl vessels 26 feet or longer.  [AR9470].  Even if Alternative 4 might

have addressed most of the documented safety/performance concerns, as Plaintiffs

contend, the Service reasonably rejected it because it would have affected

"significantly more vessels (2,913) and [led] to higher TED costs and greater

shrimp revenue losses compared to" the final rule.  [AR9470]; *see also* [AR11345-

46].  The Service concluded that the original alternatives, including Alternative 4,

did not adequately address the "public comment regarding potential negative

effects of the proposed rule."  [AR1674]; *see also* [AR11344].  The Service

developed and ultimately approved Alternative 8 "to reduce the rule's negative

effects on industry participants, while still resulting in significant sea turtle

conservation."  [AR11343]; *see also* [AR9435-36, 9457-58, 9470].[6]

Because the economic concerns raised in the comments were integral to the

Service's decision to select Alternative 8, whether the safety/performance concerns

*alone* would have justified that decision is immaterial.  The Service reasonably

drew the regulatory line where it did because doing so achieved a significant

conservation benefit while adequately addressing *both* concerns.  *See* [AR9457;

---

[6] Plaintiffs note that a Service official inadvertently signed a draft record of decision that would have adopted Alternative 4.  Opening Br. 25.  However, as the official subsequently explained in a sworn declaration, that draft obviously was signed in error because it does not accurately reflect the alternatives analyzed in the final EIS.  [AR11334, 11337-38].  The district court thus did not abuse its discretion in considering the corrected record of decision to be part of the administrative record for the final rule.  [ECF 35 at n.15; AR11339-49].

AR11343-44].  Because the agency's explanation taken "as a whole" shows that it "examined the data, considered the relevant factors, and made a reasonable judgment based on the record," the explanation "passes muster under the APA." *MD Pharmaceutical v. Drug Enforcement Admin*., 133 F.3d 8, 16 (D.C. Cir. 1998).

Nothing in *United States Sugar Corp. v. EPA*, 830 F.3d 579 (D.C. Cir. 2016), supports a different conclusion.  *See* Opening Br. 26-27.  That case involved an EPA rule exempting synthetic boilers from Clean Air Act permitting requirements.  EPA concluded in an early version of the rule that only a distinct boiler category ("natural" boilers) should be exempted.  830 F.3d at 647-48.  EPA later decided to exempt both categories, but the agency's reasons for exempting synthetic boilers "appear[ed] to directly contradict the distinctions that EPA listed in its earlier version of the rule." *Id*. at 649.  The Court held that EPA had to address those "unexplained inconsistences," and better explain why its rationale for exempting natural boilers "identically applied to synthetic" boilers. *Id*. at 650.

This case bears no resemblance to *Sugar Corp*.  As an initial matter, this rulemaking does not involve distinct skimmer trawl "categories."  Contrary to Plaintiffs' repeated assertions, *e.g*., Opening Br. 2, 20, 22, 25, 26, 30, the Service did not establish or recognize a "moderate-length vessel category" consisting of skimmer trawl vessels between 26 and 40 feet in length.  As discussed, the Service selected the 26-foot length threshold for Alternatives 2 and 4 because the agency

31

lacked data on TED use on smaller vessels, [AR1312], not because vessels

between 26 and 40 feet comprise a separate size "category."

The only reference in the final rule and EIS to distinct, size-based vessel

categories appears in the discussion of economic impacts. In that context, the

Service stated that "a 'small' vessel [is] a vessel less than 60 [feet] while a 'large'

vessel is a vessel greater than or equal to 60 [feet]." [AR1821, 2157, 9467].

Otherwise, as the district court correctly stated, there is simply a "spectrum" of

vessel lengths, [ECF 35 at 29 n.13], ranging "from small vessels (e.g., 20-25 feet

[ft] in length) … to larger vessels (e.g., 75 ft in length)." [AR1657].

Because a "moderate length vessel category" covering skimmer trawls

between 26 and 40 feet does not exist, the final rule made no findings relating to

that fictional category which "contradict[]" earlier findings in the proposed rule.

*Sugar Corp.*, 830 F.3d at 650. True, the Service did explain in the draft EIS that

the 26-foot delineation point used for Alternatives 2 and 4 was based in part on

safety concerns relating to TED use on smaller vessels that had been raised during

the initial public scoping process. [AR1312-13]. But, as noted above, the 26-foot

threshold was based primarily on the lack of data relating to TED use on smaller

vessels. *Id*. And nowhere in the proposed rule or draft EIS did the Service purport

to make any definitive finding that requiring TEDs on skimmer trawl vessels over

26 feet raised no safety, performance, or economic concerns. *See id*.

Furthermore, the Service did not draw the regulatory line at 40 feet because that marks the upper bound of a nonexistent "moderate length vessel category." *See* [AR1802] (citing skimmer trawl vessels *up to 61 feet* as examples of moderate-length vessels). The Service selected 40 feet as the delineation point because doing so "achieve[d] a significant conservation benefit for listed sea turtles, while affecting significantly fewer vessels and imposing far fewer costs upon industry." [AR9457]. The Service sought to "focus conservation requirements on larger, full-time vessels that would be expected to encounter sea turtles on the fishing grounds more frequently than smaller, part-time vessels," [AR1674], and "many" of those full-time vessels "are 40 feet and greater in length," [AR9463].

Finally, as the district court correctly observed, the Service's decision to expand the required use of TEDs only to skimmer trawls 40 feet or longer could not have contradicted any determinations in the proposed rule because those determinations were expressly "labeled as 'preliminary.'" [ECF 35 at 29 n.2] (quoting [AR2156]). That the Service may have reexamined and revised its preliminary determinations in response to public comments does not make the final rule arbitrary or capricious. "Agencies are free—indeed, they are encouraged—to modify proposed rules as a result of the comments they receive." *Northeast Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951 (D.C. Cir. 2004).

33

**B.    The Service reasonably accounted for the 2018 study on sea turtle bycatch in the otter trawl fleet.**

The Service also stated that the changes from the proposed rule were based in part on "new information indicating significantly lower levels of sea turtle mortality in the offshore fleet." [AR9457]. The referenced new information is the 2018 study showing lower-than-anticipated sea turtle bycatch by otter trawl vessels operating offshore. [AR9462]. Plaintiffs argue that it was arbitrary for the Service to use the study "to justify weakening TED requirements for skimmer trawls," when the study allegedly underscores the need to extend TED requirements to all skimmer trawls. Opening Br. 18, 27-28. This argument also lacks merit.

As the Service explained, the 2018 study refutes the claim advanced in some comments that the data does not justify expanding TED requirements to *any* skimmer trawls. *See* [AR9462]. The study indicates that sea turtle bycatch in the otter trawl fleet "is significantly lower than previously estimated." [AR9462]. That means that skimmer trawls are responsible for a greater share of the bycatch, which "further supports the need for sea turtle conservation in the skimmer trawl fisheries." *Id*.; *see also* [AR1798, 9436]. At the same time, the study does not address what level of additional regulation may be advisable or appropriate. Nor does it imply "a *stronger* need for TED requirements on all skimmer trawls than understood at the proposed rule stage," Opening Br. 18, because the study results

indicate that the overall level of sea turtle bycatch in the trawl fleet is lower than expected (due to the lower-than-expected bycatch in the otter trawl fleet).

After considering the study and weighing the other factors discussed above, the Service reasonably decided to expand the required use of TEDs to skimmer trawl vessels 40 feet or longer, which achieves a significant conservation benefit by avoiding 801-1,158 sea turtle mortalities annually.  [AR9457].  Because Plaintiffs do not claim that the Service's decision violates the ESA, or that the agency relied on any impermissible legal considerations, the agency's judgment is entitled to deference.  *See North America's Bldg. Trades Unions v. OSHA*, 878 F.3d 271, 303 (D.C. Cir. 2017) (where an agency has "explained its logic and the policies underlying its choices, [courts] have no basis for second-guessing its reasonable judgments").  And even if the Service could have better explained how the study factored into its decision-making, courts "must uphold a decision of less than ideal clarity" where (as here) "the agency's path may reasonably be discerned."  *Epsilon Electronics, Inc. v. Department of Treasury*, 857 F.3d 913, 928-29 (D.C. Cir. 2017) (internal quotation marks omitted).

## II.    The final TED rule is a logical outgrowth of the proposed rule.

In addition to being adequately explained and supported by the record, the final rule complies with the APA's notice requirements because it is a logical outgrowth of the proposed rule.

The APA requires that a notice of proposed rulemaking include "either the terms or substance of the proposed rule or a description of the subjects and issues involved."  5 U.S.C. § 553(b)(3).  Courts have "generally interpreted this to mean that the final rule the agency adopts must be a logical outgrowth of the rule proposed."  *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (internal quotation marks omitted).  "A final rule is the logical outgrowth of a proposed rule if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period."  *Chesapeake Climate Action Network v. EPA*, 952 F.3d 310, 319 (D.C. Cir. 2020) (internal quotation marks omitted).

Plaintiffs contend that the final TED rule is not a logical outgrowth of the proposed rule because the final rule created an "exemption" from TED requirements "for an entirely new vessel category—moderate-length skimmer trawl vessels—with no prior public notice of the exemption or opportunity to comment on it."  Opening Br. 31.  This argument fails because it mischaracterizes the nature and effect of the rulemaking.

The final rule did not "exempt" a (nonexistent) moderate-length skimmer trawl vessel category from TED requirements because *no* skimmer trawlers were required to use TEDs before the rule was issued.  The final rule instead *expanded* the required use of TEDs relative to the status quo to a subset of skimmer trawls

covered by the proposed rule:  whereas the proposal would have required TEDs on all skimmer trawl vessels, regardless of length, the final rule expanded TED requirements to skimmer trawl vessels 40 feet or longer.  Because the final rule is within the scope of the proposed rule, it is a logical outgrowth of the proposal.  "It takes no great leap of logic or imagination to contemplate that the ultimate outcome of this rulemaking might be no rule, or only partial adoption of the proposed comprehensive rule."  *Association of Am. Railroads v. U.S. Dep't of Transp.*, 38 F.3d 582, 589 (D.C. Cir. 1994); *see also Idaho Conservation League v. Wheeler*, 930 F.3d 494, 508 (D.C. Cir. 2019) (noting that one "logical outgrowth of a proposal is surely … to refrain from taking the proposed step") (citation omitted).

The Service also put interested parties on notice that it was considering alternatives that "would require TED use by various types *and/or size* shrimp trawlers to reduce the incidental bycatch and mortality of small sea turtles in the shrimp fisheries."  [AR1508] (emphasis added).  Thus, Alternative 2 would have expanded the required use of TEDs to non-otter trawl vessels 26 feet or longer, and Alternative 4 would have required TEDs only on skimmer trawls 26 feet or longer.  [AR2159].  The only difference between the final rule and Alternative 4 is that the final rule draws the line at 40 feet instead of 26 feet, primarily to reduce the number of vessels affected and the associated economic impacts—a key factor highlighted for discussion in the proposed rule.  *See* [AR2157-60].

That the final rule is not identical to Alternative 4 is immaterial.  There is no requirement that an agency "select a final rule from among the precise proposals under consideration during the comment period."  *Sierra Club v. Costle*, 657 F.2d 298, 352 (D.C. Cir. 1981).  "It is entirely proper and often necessary for the agency to continue its deliberations and internal decisionmaking process after the close of public comment in order to assimilate those comments and arrive at a policy choice."  *Id*. at 352-53.  The "exact result reached after a notice and comment rulemaking need not be set out in the initial notice for the notice to be sufficient." *Public Service Comm'n v. FCC*, 906 F.2d 713, 717 (D.C. Cir. 1990).

The proposed rule also put interested parties on notice that the Service was considering phasing in any new TED requirements "based on vessel size, where the largest vessels would be the first vessels required to install" TEDs, because targeting larger, full-time vessels would "first implement the requirement where it would achieve the greatest conservation benefit for listed sea turtles."  [AR2156]. The final rule follows the same logic:  it expands the required use of TEDs to skimmer trawlers 40 feet or longer to "focus conservation requirements on larger, full-time vessels that would be expected to encounter sea turtles on the fishing grounds more frequently than smaller, part-time vessels," [AR1674]; *see also* [AR9463], while also noting that the Service "may address other trawls, such as pusher-head trawls, wing nets, and try nets, as well as small skimmer trawl vessels,

in [a] future rulemaking," [AR9466].  The final rule thus is not "wholly unrelated or surprisingly distant from what [the Service] initially suggested." *Arizona Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000).

The changes in the final rule also were a direct response to comments "regarding potential negative economic effects of the proposed rule and questioning the need for additional sea turtle conservation measures."  [AR1674]. A "reasonable attempt to accommodate commentators by responding to their suggestions for changes does not render a final rule something other than a logical outgrowth of the original proposal." *Public Service Comm'n*, 906 F.2d at 717. And because the changes were driven in part by comments on the economic impacts highlighted in the proposed rule, the changes were not "so major that the original notice did not adequately frame the subjects for discussion." *Omnipoint Corp. v. FCC*, 78 F.3d 620, 631 (D.C. Cir. 1996) (citation omitted).

Plaintiffs' reliance on *CSX Transportation, Inc. v. Surface Transportation Board*, 584 F.3d 1076 (D.C. Cir. 2009), is misplaced.  The proposed rule there would have authorized parties challenging rail rates to identify "comparison groups" of rail movements drawn only from the most recent year of available data. The final rule, however, authorized parties to draw comparison groups from the four most recent years of data.  *Id*. at 1078.  The final rule was not a logical outgrowth of the proposal, the Court held, because nothing in the proposal

39

indicated that the agency "might consider expanding the comparison group data from one to four years." *Id*. at 1082. The agency's final rule, in other words, went *beyond* the limits of what was initially proposed for consideration. *See id*.

That is not what happened here. As discussed, the Service initially proposed expanding the required use of TEDs to *all* skimmer trawls, which "effectively raised the question as to whether this made sense." *Arizona Pub. Serv. Co.*, 211 F.3d at 1299. In response to comments, the Service decided to expand the required use of TEDs only to a subset of skimmer trawls, which achieved a significant conservation benefit while substantially reducing the number of vessels affected and the associated economic impacts. [AR9457]. Because the final rule here was within the scope of the proposal and based on the same conservation and economic considerations highlighted in the proposal, the rulemaking complied with the APA's notice requirements. *See Arizona Pub. Serv. Co.*, 211 F.3d at 1299-1300 (agency complied with the APA when it proposed that Indian tribes be required to meet the "same requirements" as States with respect to judicial review of Clean Air Act permitting actions, but ultimately adopted a final rule exempting tribes from some (but not all) of those requirements).

Plaintiffs also were not prejudiced by the alleged notice violation. *See* 5 U.S.C. § 706 (courts reviewing agency action under the APA must take "due account … of the rule of prejudicial error"). Plaintiffs submitted detailed

comments urging the Service to adopt the proposed rule and to "implement the proposed TEDs requirement on all skimmer trawls." [AR3526]. Plaintiffs' comments did not address Alternative 4, requiring the use of TEDs only on skimmer trawl vessels 26 feet or longer. *See* [AR3525-35, 7642-48]. Plaintiffs nevertheless assert that if the Service had disclosed that it was considering an alternative identical to Alternative 4, but with the length threshold set at 40 feet, they would have submitted comments stating that the safety/performance concerns documented in the record apply only to vessels under 26 feet. Opening Br. 35.

Plaintiffs were not prejudiced by their inability to submit such comments because they would not amount to "new and different criticisms which the agency might find convincing." *Int'l Union, United Mine Workers of Am. v. Mine Safety and Health Admin.*, 626 F.3d 84, 95 (D.C. Cir. 2010) (citation omitted). As discussed, even if Alternative 4 would have adequately addressed most of the safety and performance concerns, the Service reasonably rejected it because it would have affected significantly more vessels than the final rule; it would have led to higher TED costs and revenue losses; it could have caused an additional 623 vessels to cease operations; and it would have required an additional 1.5 years to produce the required number of TEDs. [AR9470]; *see supra* pp. 29-31. Plaintiffs' proposed comments would not address any of those key points.

Plaintiffs also assert that they would have submitted comments stating that the 2018 study on sea turtle bycatch in the otter trawl fleet supports "the need for TEDs on the full scope of the skimmer trawl fishery."  Opening Br. 36.  But the Service already recognized that the 2018 study and other data "support[] the need for sea turtle conservation in the skimmer trawl fisheries."  [AR9462].  The agency thus decided to expand the required use of TEDs to certain skimmer trawl vessels.  [AR9456].  Aside from repeating the claim in their original comments that TEDs should be required on *all* skimmer trawls, Plaintiffs have not shown that they "had something useful to say" on the matter.  *Chamber of Commerce v. SEC*, 443 F.3d 890, 905 (D.C. Cir. 2006); *see also Florida Power & Light Co. v. United States*, 846 F.2d 765, 772 (D.C. Cir. 1988) (petitioners not prejudiced by short comment period where they did not show that they would have advanced any "substantive challenges which differ in kind from the original comments").

Plaintiffs also assert that they would have submitted "information on the impacts of exempting moderate-length skimmer trawl vessels on particular sea turtle species."  Opening Br. 36.  But Plaintiffs do not explain why the Service might have found this unidentified information convincing.  In their comments, Plaintiffs endorsed the Service's finding that Alternative 3 would "prevent an estimated 1,730-2,500 sea turtle mortalities each year."  [AR3526].  Using the same methodology, the Service estimated that the final rule would prevent 801-

42

1,158 sea turtle mortalities annually, [AR1894], and that the conserved sea turtles would be "predominantly endangered Kemp's ridley and threatened green sea turtles," [AR11344]; *see also* [AR1936]. Plaintiffs have not proffered any "specific and credible objections" to either point. *Chamber of Commerce*, 443 F.3d at 905; *see also Int'l Union*, 626 F.3d at 96 (no prejudice where petitioner did not point to any "new evidence that it would have submitted in comments").

In short, because Plaintiffs already "explicitly or implicitly conveyed [their] views in opposition" to anything less than a rule requiring TEDs on all skimmer trawl vessels, *Int'l Union*, 626 F.3d at 96; [AR3525-34, 7642-48], Plaintiffs were not prejudiced by the lack of a second round of notice and comment.

## III.    The Service's analysis of the final rule's beneficial environmental effects complies with NEPA.

Before issuing the final rule, the Service prepared an EIS pursuant to NEPA. The EIS's analysis of the beneficial environmental impact of each action alternative focused on the total number of sea turtle mortalities that would be avoided each year in the Gulf of Mexico and South Atlantic (North Carolina) shrimp fisheries. *See* [AR1300, 1430-40, 1662, 1799-1811]. Plaintiffs implicitly endorsed this approach in their comments, stating that Service's proposal to adopt Alternative 3 was an "obvious" and "well supported action" because it would "prevent an estimated 1,730-2,500 sea turtle mortalities each year," [AR3526, 7642-43]—a figure that comes directly from the EIS, [AR1300, 1662]. But now

Plaintiffs argue that the EIS is deficient because NEPA allegedly required a more detailed, species-by-species analysis of each alternative's conservation benefits. Opening Br. 37-45. Plaintiffs forfeited this objection by not raising it during the administrative process, and the objection lacks merit in any event.

### A. Plaintiffs forfeited their objection to the Service's analysis.

Persons "'challenging an agency's compliance with NEPA must structure their participation so that it … alerts the agency to the [parties'] position and contentions,' and failure to do so 'forfeit[s] any objection' to the environmental analysis on that ground." *Sierra Club v. FERC*, 827 F.3d 36, 50-51 (D.C. Cir. 2016) (quoting *Department of Transp. v. Public Citizen*, 541 U.S. 752, 764 (2004)); *accord Nevada v. Dep't of Energy*, 457 F.3d 78, 88 (D.C. Cir. 2006). Here, Plaintiffs forfeited any objection to the Service's approach to analyzing the beneficial environmental effects of each action alternative by failing to raise any objection during the administrative process.

The draft EIS described the anticipated beneficial impacts of each action alternative in terms of the total number of annual sea turtle mortalities that would be avoided. [AR1300, 1430-40, 2159-60]. Plaintiffs did not object to that approach; Plaintiffs instead relied on the Service's estimates in advocating for the adoption of Alternative 3. [AR3526, 7642-43]. And the Service did not alter its approach after developing Alternative 8. The final EIS analyzed the beneficial

effects of each action alternative, including Alternative 8, in the same manner as the draft EIS—precisely because neither Plaintiffs nor any other commenters objected to the Service's approach. *See* [AR1662, 1799-1811, 2050-69].

By failing to raise their current objections during the administrative process, Plaintiffs deprived the Service of an opportunity to address the objections before making a final decision. Plaintiffs have therefore forfeited any objection to the EIS on the ground that it does not adequately discuss the conservation benefits of each alternative. *Public Citizen*, 541 U.S. at 764-65; *Sierra Club*, 827 F.3d at 50-51.

Although the Service did not argue forfeiture below, "an appellate court can affirm a district court judgment on the basis of any grounds which support it." *In re Swine Flu Immunization Products Liability Litig.*, 880 F.2d 1439, 1444 (D.C. Cir. 1989) (holding that the Court could properly consider a theory advanced by the government in support of the district court's judgment, even though the theory had not been raised in district court). Moreover, the "matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121, (1976). "Exercise of that discretion is particularly appropriate where, as here, the question is a purely legal one, the resolution of which would not be aided by any further factual development." *White v. U.S. Dep't of the Army*, 720 F.2d 209, 211 (D.C. Cir. 1983). And because

Plaintiffs will have the opportunity to address forfeiture in their reply brief, "no 'injustice' will be done if [the Court] decide[s] the issue." *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 686 (D.C. Cir. 2010).  The Court should therefore hold that Plaintiffs forfeited their objection to the EIS and, on that basis, affirm the district court's judgment in favor of the Service on Plaintiffs' NEPA claim.

### B.    The Service's approach complied with NEPA.

Even if Plaintiffs did not forfeit their objection, the objection lacks merit. The Service's analysis of the beneficial environmental effects of each action alternative complied with NEPA by facilitating a meaningful comparison of alternatives and informed agency decision-making.

Before approving a major federal action, NEPA directs an agency to "take a hard look at environmental impacts," *NRDC v. U.S. Nuclear Regulatory Comm'n*, 823 F.3d 641, 642 (D.C. Cir. 2016), which may include "both beneficial and detrimental effects," 40 C.F.R. § 1508.8.  But NEPA "does not mandate adoption of a particular process for doing so." *NRDC v. U.S. Nuclear Regulatory Comm'n*, 823 F.3d at 642.  "The rule of reason governs [the Court's] review of an agency's environmental analysis," *Mayo v. Reynolds*, 875 F.3d 11, 20 (D.C. Cir. 2017), and courts "give deference to agency judgments as to how best to prepare an EIS," *Indian River Cnty. v. U.S. Dep't of Transp*., 945 F.3d 515, 533 (D.C. Cir. 2019).

Here, the Service's analysis of the final rule's beneficial environmental effects satisfies NEPA's rule of reason and is entitled to deference.

The purpose of the rulemaking was "to reduce incidental bycatch and mortality of sea turtles … , and to aid in the protection and recovery of listed sea turtle populations." [AR2154]. The Service thus prepared an EIS analyzing "a range of potential alternatives to reduce the incidental bycatch and mortality of sea turtles" in the southeastern U.S. shrimp fisheries. [AR1653, 1659]. Because the rulemaking was not designed to achieve a specific conservation target for any one species, the Service reasonably focused on the overall number of annual sea turtle mortalities that would be avoided, breaking the numbers down between the Gulf of Mexico and South Atlantic (North Carolina) shrimp fisheries. [AR1999-1811].

The analysis shows that approximately 97 percent of sea turtles conserved under each action alternative would occur in the Gulf of Mexico. *See* [AR1811]. In North Carolina, otter trawls harvest the bulk of shrimp, with skimmer trawls accounting for only three percent of the total catch. [AR1688]. Although shrimp trawlers may incidentally take any of the five potentially affected sea turtle species, [AR1696], the Service estimated that roughly 80 percent of the conserved sea turtles likely would be Kemp's ridleys and 20 percent would be green sea turtles. [AR1531-32, 1918]. Those estimates are consistent with the observer data gathered on Gulf of Mexico skimmer trawl vessels. Although the observer data

47

documents some interactions with loggerhead sea turtles, most involved Kemp's ridley or green sea turtles.  [AR10783, 10814, 10845, 11194].

The estimates are also consistent with other species-specific information disclosed in the EIS.  Kemp's ridley sea turtles utilize the Gulf of Mexico as their primary habitat for most life stages.  [AR1903].  Skimmer trawls in the Gulf are used in Louisiana, Mississippi, and Alabama.  [AR1668].  More than 80 percent of reported sea turtle strandings in those states between 2011 and 2014 were Kemp's ridleys, which could be "a function of the species' preference for shallow … waters coupled with increased population abundance, as reflected in recent Kemp's ridley nesting increases."  [AR1712-13].  Kemp's ridley nesting "has experienced significant increases in the past 15 years and is trending positively overall," and green turtle nesting "has also been increasing in recent years."  [AR1668].  The available information thus indicates that both species "are becoming more common in shallow, state waters of the Gulf of Mexico and the Atlantic coast.  Furthermore, the skimmer trawl fisheries have been documented to interact with these sea turtle species in the times and areas the fisheries operate."  [AR1668].  In contrast, the EIS indicates that the loggerhead's "primary habitat is not in the fishing grounds," and hawksbill and leatherback sea turtles "are relatively less common in nearshore Gulf habitats."  Opening Br. 41 (citing [AR1707, 1715, 1721-24]).  The EIS

48

citations in Plaintiffs' own brief thus refute the claim that the Service "ignored" "[s]pecies-specific habitat use." *Id*. at 42; *see also* [AR1903-04].

In short, the EIS quantifies the beneficial environmental effects of each action alternative using "the best available information on the effects of skimmer trawls on sea turtle populations," [AR11193], and discloses that most of the anticipated conservation benefits will result from "reduced mortalities of endangered Kemp's ridley[] sea turtles" and, to a lesser extent, "reduced mortalities of threatened green sea turtles." [AR1936]; *see also* [AR11344] (discussing Alternative 8); [AR2074] (draft record of decision of decision reaching same conclusion for Alternative 4). At the same time, the EIS also discloses the adverse economic impacts of each action alternative, including the number of vessels affected, the TED costs and anticipated revenue losses, and the number of vessels that could cease operations. [AR1865, 1893-94]. The Service's analysis of each alternative's beneficial and adverse effects thus achieved NEPA's objectives by "sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. 1502.14.

Nothing in NEPA or its implementing regulations required a more detailed, species-by-species analysis of each alternative's beneficial effects. Plaintiffs' reliance on 40 C.F.R. § 1508.27(b)(9) is misplaced. *See* Opening Br. 38. That regulation indicates that the significance of an action's environmental impact

depends on the "severity of impact," which requires consideration of the "degree to which the action may adversely affect an endangered or threatened species." *Id*. But that provision is inapplicable here because the final rule, which *expands* the required use of TEDs, does not *adversely affect* a listed species. [AR9457]; *see also* Opening Br. 45 (acknowledging that the rule provides "additional protection to sea turtles by requiring TEDs on a portion of the southeastern U.S. shrimp fleet that would be lost" if the rule were vacated). And neither 40 C.F.R. § 1508.27 nor any of the cases cited in Plaintiffs' brief purports to mandate that an EIS analyze beneficial *or* adverse impacts on listed species in any particular manner.

Borrowing a concept from the jeopardy analysis required under Section 7 of the ESA, Plaintiffs argue that "the degree to which each species is impacted depends on putting estimated mortality numbers in the context of the species' population baseline." Opening Br. 42; *see also* 50 C.F.R. § 402.02 (defining the "environmental baseline" for purposes of the jeopardy analysis). Plaintiffs explain that an endangered species with lower population numbers, like the Kemp's ridley, "will be more susceptible to population-level harm from deaths of individuals than a species with a more robust population." Opening Br. 42.[7] That observation may

---

[7] As discussed, the Service separately concluded that its continued authorization of the southeastern U.S. shrimp fisheries under the sea turtle conservation regulations, as amended by the final TED rule, is not likely to jeopardize any listed sea turtle species, including the Kemp's ridley. [AR11037-51, 11216-38]. Plaintiffs do not challenge that conclusion or the Service's compliance with ESA Section 7.

be true as a general matter.  But this case  does not involve an agency action that could tip a species with a small population "from a state of precarious survival into a state of likely extinction" by increasing annual mortalities and causing new, population-level harm.  *Defenders of Wildlife v. U.S. Dep't of the Interior*, 931 F.3d 339, 353 (4th Cir. 2019); Opening Br. 42.  The only agency action at issue here is the final TED rule, which "provides additional protection to sea turtles," Opening Br. 45, by substantially *reducing* annual mortalities (predominantly Kemp's ridleys) in comparison to the status quo.  [AR1894, 1918, 1936, 11344].

As stated, the objective of this rulemaking was "to *reduce* incidental bycatch and mortality of sea turtles … , and to aid in the protection and recovery of listed sea turtle populations."  [AR2154] (emphasis added).  As Plaintiffs' own comments indicate, the analysis in the EIS allowed the public and agency decision-makers to meaningfully assess the extent to which each action alternative would achieve that objective, which is all that NEPA requires.  *See* [AR3525-34, 7642-48].  Although Plaintiffs obviously disagree with the Service's decision to select Alternative 8 instead of Alternative 3, "NEPA does not require a particular substantive result."  *Sierra Club v. FERC*, 867 F.3d 1357, 1376 (D.C. Cir. 2017).

# CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.[8]

Respectfully submitted,

/s/ *Kevin W. McArdle*
TODD KIM
*Assistant Attorney General*

RACHEL HERON
ANDREW M. BERNIE
Of Counsel:                              MARK A. BROWN
                                         HANNAH O'KEEFE
SHEPHERD R. GRIMES                       KEVIN W. McARDLE
*Attorney*                               *Attorneys*
NATIONAL OCEANIC AND                     Environment and Natural Resources Division
ATMOSPHERIC ADMINISTRATION               U.S. Department of Justice
                                         Post Office Box 7415
                                         Washington, D.C. 20044
                                         Tele:  (202) 305-0219
                                         kevin.mcardle@usdoj.gov

June 16, 2023
DJ No. 90-8-6-08466

---

[8] Should the Court rule in Plaintiffs' favor on any issue, the Court should deny Plaintiffs' request for a "one-year remand deadline."  Opening Br. 46.  The time needed to complete administrative proceedings on remand would depend on the nature of any error the Court may identify and the Service's workload, data needs, and resource constraints at the time of the Court's ruling.  *See* [ECF 30-2].  The appropriateness of any remand deadline thus requires further factual development and should be left for the district court to resolve in the first instance.  The Service agrees with Plaintiffs that vacatur of the final rule would be inappropriate.  To the extent the Court rules in Plaintiffs' favor on any issue, any relief should be limited to a remand to the Service to give the agency an opportunity to better explain its prior decision or any modified course of action it might elect to take.

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 12,243 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Kevin W. McArdle*
KEVIN W. McARDLE

Counsel for Defendants/Appellees

# ADDENDUM

**Administrative Procedure Act**

    5 U.S.C. § 553 ........................................................................................1a

**Endangered Species Act**

    16 U.S.C. § 1532 ....................................................................................2a

    16 U.S.C. § 1533 ....................................................................................3a

    16 U.S.C. § 1536 ....................................................................................4a

    16 U.S.C. § 1540 ....................................................................................6a

**National Environmental Policy Act**

    42 U.S.C. § 4332 ....................................................................................7a

**National Environmental Policy Act Regulations**

    40 C.F.R. § 1508.8 (2019) ....................................................................8a

**Endangered Species Act Regulations**

    50 C.F.R. § 222.102 ..............................................................................9a

    50 C.F.R. § 223.206 ............................................................................10a

    50 C.F.R. § 224.104 ............................................................................12a

    50 C.F.R. § 402.02 ..............................................................................13a

## 5 U.S.C. § 553 – Rule making

* * * *

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law. The notice shall include--

(1) a statement of the time, place, and nature of public rule making proceedings;

(2) reference to the legal authority under which the rule is proposed; and

(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

## 16 U.S.C. § 1532 – Definitions

For the purposes of this chapter—

* * * *

(19) The term "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.

## 16 U.S.C. § 1533 – Determination of endangered species and threatened species

* * * *

**(d) Protective regulations**

Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species. The Secretary may by regulation prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) of this title, in the case of fish or wildlife, or section 1538(a)(2) of this title, in the case of plants, with respect to endangered species; except that with respect to the taking of resident species of fish or wildlife, such regulations shall apply in any State which has entered into a cooperative agreement pursuant to section 1535(c) of this title only to the extent that such regulations have also been adopted by such State.

* * * *

## 16 U.S.C. § 1536 – Interagency cooperation

**(a) Federal agency actions and consultations**

* * * *

(2) Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

* * * *

**(b) Opinion of Secretary**

* * * *

(3)(A) Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

* * * *

(4) If after consultation under subsection (a)(2), the Secretary concludes that--

(A) the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

(B) the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

(C) if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that—

**4a**

(i) specifies the impact of such incidental taking on the species,

(ii) specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

(iii) in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

(iv) sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).
* * * *

**(o) Exemption as providing exception on taking of endangered species**
Notwithstanding sections 1533(d) and 1538(a)(1)(B) and (C) of this title, sections 1371 and 1372 of this title, or any regulation promulgated to implement any such section—

(1) any action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action; and

(2) any taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned.

## 16 U.S.C. § 1540 – Penalties and enforcement

* * * *

## (f) Regulations

The Secretary, the Secretary of the Treasury, and the Secretary of the Department in which the Coast Guard is operating, are authorized to promulgate such regulations as may be appropriate to enforce this chapter, and charge reasonable fees for expenses to the Government connected with permits or certificates authorized by this chapter including processing applications and reasonable inspections, and with the transfer, board, handling, or storage of fish or wildlife or plants and evidentiary items seized and forfeited under this chapter. All such fees collected pursuant to this subsection shall be deposited in the Treasury to the credit of the appropriation which is current and chargeable for the cost of furnishing the services. Appropriated funds may be expended pending reimbursement from parties in interest.

**42 U.S.C. § 4332 (2021) – Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts**

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

* * * *

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

## 40 C.F.R. § 1508.8 (2019) – Effects

Effects include:

(a) Direct effects, which are caused by the action and occur at the same time and place.

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

## 50 C.F.R. § 222.102 – Definitions

* * * *

Pusher-head trawl (chopsticks) means a trawl that is spread by two poles suspended from the bow of the trawler in an inverted "V" configuration.

* * * *

Shrimp trawler means any vessel that is equipped with one or more trawl nets and that is capable of, or used for, fishing for shrimp, or whose on-board or landed catch of shrimp is more than 1 percent, by weight, of all fish comprising its on-board or landed catch.

Skimmer trawl means a trawl that is fished along the side of the vessel and is held open by a rigid frame and a lead weight. On its outboard side, the trawl is held open by one side of the frame extending downward and, on its inboard side, by a lead weight attached by cable or rope to the bow of the vessel.

* * * *

Wing net (butterfly trawl) means a trawl that is fished along the side of the vessel and that is held open by a four-sided, rigid frame attached to the outrigger of the vessel.

**9a**

### 50 C.F.R. § 223.206 – Exceptions to prohibitions relating to sea turtles

* * * *

(d) Exception for incidental taking. The prohibitions against taking in § 223.205(a) do not apply to the incidental take of any member of a threatened species of sea turtle (i.e., a take not directed towards such member) during fishing or scientific research activities, to the extent that those involved are in compliance with all applicable requirements of paragraphs (d)(1) through (d)(11) of this section, or in compliance with the terms and conditions of an incidental take permit issued pursuant to paragraph (a)(2) of this section.

* * * *

(2) Gear requirements for trawlers—

(i) TED requirement for shrimp trawlers. Any shrimp trawler that is in the Atlantic Area or Gulf Area must have an approved TED installed in each net that is rigged for fishing. A net is rigged for fishing if it is in the water, or if it is shackled, tied, or otherwise connected to any trawl door or board, or to any tow rope, cable, pole or extension, either on board or attached in any manner to the shrimp trawler. Exceptions to the TED requirement for shrimp trawlers are provided in paragraph (d)(2)(ii) of this section.

(ii) Exemptions from the TED requirement—

(A) Alternative tow-time restrictions. A shrimp trawler is exempt from the TED requirements of paragraph (d)(2)(i) of this section if it complies with the alternative tow-time restrictions in paragraph (d)(3)(i) of this section and if it:

(1) Has on board no power or mechanical-advantage trawl retrieval system (i.e., any device used to haul any part of the net aboard);

(2) Is a bait shrimper that retains all live shrimp on board with a circulating seawater system, if it does not possess more than 32 lb. (14.5 kg) of dead shrimp on board, if it has a valid original state bait-shrimp license, and if the state license allows the licensed vessel to participate in the bait shrimp fishery exclusively;

(3) Has only a pusher-head trawl or a wing net, or has a skimmer trawl on a vessel less than 40 ft (12.2 m) in length as indicated on the vessel's state vessel registration or U.S. Coast Guard vessel documentation.

**10a**

(4) Is in an area during a period for which tow-time restrictions apply under paragraphs (d)(3)(ii) or (iii) of this section, if it complies with all applicable provisions imposed under those paragraphs; or

(5) Is using a single test net (try net) with a headrope length of 12 ft (3.6 m) or less and with a footrope length of 15 ft (4.6 m) or less, if it is pulled immediately in front of another net or is not connected to another net in any way, if no more than one test net is used at a time, and if it is not towed as a primary net, in which case the exemption under this paragraph (d)(2)(ii)(A) applies to the test net.

* * * *

(3) Tow-time restrictions—

(i) Duration of tows. If tow-time restrictions are used pursuant to paragraph (d)(2)(ii), (d)(3)(ii), or (d)(3)(iii) of this section, a shrimp trawler must limit tow times. The tow time begins at the time the trawl door enters the water and ends at the time the trawl door is removed from the water. For a trawl that is not attached to a door, the tow time begins at the time the codend enters the water and ends at the time the codend is emptied of catch on deck. Tow times may not exceed:
    (A) 55 minutes from April 1 through October 31; and
    (B) 75 minutes from November 1 through March 31.

* * * *

(4) Limitations on incidental takings during fishing activities—

(i) Limitations. The exemption for incidental takings of sea turtles in paragraph (d) of this section does not authorize incidental takings during fishing activities if the takings:

(A) Would violate the restrictions, terms, or conditions of an incidental take statement or biological opinion;

(B) Would violate the restrictions, terms, or conditions of an incidental take permit; or
(C) May be likely to jeopardize the continued existence of a species listed under the Act.

* * * *

**11a**

### 50 C.F.R. § 224.104 – Special requirements for
### fishing activities to protect endangered sea turtles

(a) Shrimp fishermen in the southeastern United States and the Gulf of Mexico who comply with rules for threatened sea turtles specified in § 223.206 of this chapter will not be subject to civil penalties under the Act for incidental captures of endangered sea turtles by shrimp trawl gear.

* * * *

(c) Special prohibitions relating to sea turtles are provided at § 223.206(d).

## 50 C.F.R. § 402.02 – Definitions

* * * *

Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline.

* * * *

13a