## ORAL ARGUMENT NOT YET SCHEDULED

No. 22-5295

---

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE, and TURTLE ISLAND RESTORATION NETWORK,

*Plaintiffs-Appellants*,

v.

NATIONAL MARINE FISHERIES SERVICE and GINA RAIMONDO, in her official capacity as Secretary of Commerce,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
NO. 1:21-CV-00930-BAH
HONORABLE BERYL A. HOWELL, U.S. DISTRICT COURT JUDGE

---

### FINAL OPENING BRIEF OF APPELLANTS

---

Christopher D. Eaton (CADC Bar No. 60490)
Stephen D. Mashuda (CADC Bar No. 60505)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
415-217-2040 Fax
ceaton@earthjustice.org
smashuda@earthjustice.org

*Attorneys for Plaintiffs-Appellants Center for Biological Diversity, Defenders of Wildlife, and Turtle Island Restoration Network*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Plaintiffs-Appellants Center for Biological Diversity, Defenders of Wildlife, and Turtle Island Restoration Network submit the following certificate of counsel.

**A. Parties and Amicus**

1. The parties who appeared before the District Court are:

   a. *Plaintiffs*: Center for Biological Diversity, Defenders of Wildlife, and Turtle Island Restoration Network.

   b. *Defendants*: National Marine Fisheries Service and Gina Raimondo, in her official capacity as Secretary of Commerce.

   c. *Amicus Curiae*: Oceana, Inc.

2. Plaintiffs-Appellants Center for Biological Diversity, Defendants of Wildlife, and Turtle Island Restoration Network are nonprofit conservation organizations. None of the organizations has a parent corporation, nor does any person or corporate entity own ten percent or more of any of the organizations.

**B. Rulings Under Review**

The ruling under review is the Order and the Memorandum Opinion entered by the United States District Court for the District of Columbia (Hon. Beryl A. Howell) on November 15, 2022, in case no. 1:21-cv-00930-BAH. The

Memorandum Opinion is reported as *Center for Biological Diversity v. National Marine Fisheries Service*, Civ. A. No. 21-930 (BAH), 2022 WL 4235013 (D.D.C. Nov. 15, 2022).

## C. Related Cases

Counsel is not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Christopher D. Eaton*
Christopher D. Eaton

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............2

TABLE OF AUTHORITIES ...................................................................6

GLOSSARY.......................................................................................10

INTRODUCTION ...............................................................................1

STATEMENT OF JURISDICTION.........................................................3

STATEMENT OF THE ISSUES.............................................................4

PERTINENT STATUTES AND REGULATIONS ....................................4

STATEMENT OF THE CASE................................................................4

I.      Southeastern U.S. Waters Are Home to Five Imperiled Sea Turtle
        Species. ...............................................................................4

II.     Mortality in Shrimp Fisheries Puts Sea Turtles in Danger of
        Extinction...........................................................................7

III.    TEDs are Proven, Effective Tools to Prevent Sea Turtle Bycatch
        Deaths. ...............................................................................9

IV.     Tow Time Limits Are Ineffective and Inadequate at Protecting Sea
        Turtles. ............................................................................11

V.      The Service Proposes Requiring TEDs on Nearly All Shrimp Trawl
        Vessels. ............................................................................13

VI.     The Service Creates a Broad Exemption for Several Categories of
        Shrimp Trawl Vessels in the Final Rule.................................14

VII.    Procedural History. ............................................................16

SUMMARY OF ARGUMENT ..............................................................17

STANDARD OF REVIEW ..................................................................19

ARGUMENT ....................................................................................20

I.      The Service Violated the APA By Justifying the Final Rule's
        Exemption for Moderate-Length Skimmer Trawl Vessels on Grounds
        that Are Unsupported by and Counter to the Record Evidence. ..................20

        A.      The Safety and Performance Ground for Exempting Moderate-
                Length Skimmer Trawl Vessels Is Belied by the Record. ..................22

        B.      New Information on Mortality in the Offshore Fleet Undercuts
                the Broad Skimmer Trawl Exemption. .................................................27

        C.      Resting the Final Rule on Two Invalid Grounds Is Arbitrary
                and Capricious. ......................................................................................29

II.     The Service Violated the APA by Creating an Exemption for a New
        Category of Vessels in the Final Rule Without Providing the Public
        Prior Notice or Opportunity to Comment........................................................31

III.    The Service Violated NEPA by Failing to Evaluate Impacts on the
        Individual Sea Turtle Species the Rule Is Intended to Protect. .....................37

IV.     The Court Should Remand the TED Rule and EIS without Vacatur
        and Impose a Remand Deadline. ...................................................................45

        CONCLUSION .........................................................................................47

## TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Am. Rivers v. FERC*,
   895 F.3d 32 (D.C. Cir. 2018)..............................................................38

*Am. Water Works Ass'n v. EPA*,
   40 F.3d 1266 (D.C. Cir. 1994)....................................................32, 35

*BellSouth Corp. v. F.C.C.*,
   162 F.3d 1215 (D.C. Cir. 1999).........................................................30

*Catawba Cnty. v. EPA*,
   571 F.3d 20 (D.C. Cir. 2009)............................................................28

*Chamber of Com. of U.S. v. Sec. & Exch. Comm'n*,
   443 F.3d 890 (D.C. Cir. 2006)..........................................................36

*Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*,
   97 F. Supp. 3d 1210 (D. Haw. 2015)...........................................41, 42

*\*CSX Transp., Inc. v. Surface Transp. Bd.*,
   584 F.3d 1076 (D.C. Cir. 2009)......................................32, 33, 34, 35

*Defs. of Wildlife v. U.S. Dep't of Interior*,
   931 F.3d 339 (4th Cir. 2019) ...........................................................42

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020)...............................................................25, 26

*Dist. Hosp. Partners, L.P. v. Burwell*,
   786 F.3d 46 (D.C. Cir. 2015)............................................................28

*Vecinos para el Bienestar Bienestar de la Comunidad Costera v. FERC*,
   6 F.4th 1321 (D.C. Cir. 2021).....................................................22, 29

*Env't Integrity Project v. EPA*,
   425 F.3d 992 (D.C. Cir. 2005).........................................................31

*Fertilizer Inst. v. EPA*,
   935 F.2d 1303 (D.C. Cir. 1991).......................................................33

*\*Authorities upon which we chiefly rely are marked with asterisks.*

*Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*,
864 F.3d 738 (D.C. Cir. 2017)......................................................24, 25

*Louisiana v. Dep't of Com.*,
No. 21-01523, 2022 WL 17251152 (E.D. La. Dec. 19, 2022)..........................17

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983)..............................................20, 21, 27, 28, 29

*Nat. Res. Def. Council, Inc. v. Hodel*,
865 F.2d 288 (D.C. Cir. 1988)....................................................44, 45

*Nat. Res. Def. Council, Inc. v. Train*,
510 F.2d 692 (D.C. Cir. 1974)........................................................46

*\*Nat'l Audubon Soc'y v. Dep't of Navy*,
422 F.3d 174 (4th Cir. 2005) ..............................................38, 41, 43

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
921 F.3d 1102 (D.C. Cir. 2019).....................................................34

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008) .......................................................46

*Oceana v. Pritzker*,
No. 1:15-cv-00555-PLF (D.D.C. Sept. 7, 2016) .........................13, 14

*Pac. Rivers Council v. U.S. Forest Serv.*,
689 F.3d 1012 (9th Cir. 2012) ......................................................38

*Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.*,
177 F. Supp. 3d 146 (D.D.C. 2016)................................................39

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989)..................................................................37

*Sierra Club v. FERC*,
827 F.3d 36 (D.C. Cir. 2016)........................................................45

*Sierra Club v. FERC*,
867 F.3d 1357 (D.C. Cir. 2017)................................................37, 43

*Small Refiner Lead Phase-Down Task Force v. EPA*,
  705 F.2d 506 (D.C. Cir. 1983) ...................................................................33, 34

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ..................................................................................9

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  661 F.3d 66 (D.C. Cir. 2011) .........................................................19, 38

*Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  437 F.3d 75 (D.C. Cir. 2006) ...............................................................27

*Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*,
  No. 1:11-cv-01813-ABJ (D.D.C. Oct. 13, 2011) ...............................12

*\*U.S. Sugar Corp. v. EPA*,
  830 F.3d 579 (D.C. Cir. 2016) ..............................................21, 26, 30

*\*Util. Solid Waste Activities Grp. v. EPA*,
  901 F.3d 414 (D.C. Cir. 2018) ......................................21, 23, 26, 31

*Washington v. U.S. Dep't of Navy*,
  No. 2:19-cv-01059-RAJ-JRC, 2021 WL 8445582 (W.D. Wash. Dec. 10, 2021) ...................................................................................38

*WildEarth Guardians v. Mont. Snowmobile Ass'n*,
  790 F.3d 920 (9th Cir. 2015) .................................................41, 42, 43

*\*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,
  475 F.3d 319 (D.C. Cir. 2006) ...........................................21, 22, 29, 30

*Wisconsin v. EPA*,
  938 F.3d 303 (D.C. Cir. 2019) ..............................................................45

## Statutes

5 U.S.C. § 553 ................................................................................31

5 U.S.C. § 706 ................................................................................20

16 U.S.C. § 1531 ..............................................................................9

16 U.S.C. § 1532 ..............................................................................9

16 U.S.C. § 1533 ....................................................................................9

16 U.S.C. § 1536 ....................................................................................9

16 U.S.C. § 1538 ....................................................................................9

16 U.S.C. § 1539 ....................................................................................9

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................3

**Regulations**

40 C.F.R. § 1502.14 ............................................................................43

40 C.F.R. § 1502.15 ............................................................................44

40 C.F.R. § 1502.16 ............................................................................44

40 C.F.R. § 1508.27 ............................................................................38

46 C.F.R. § 24.10-1 ............................................................................15

50 C.F.R. § 223.205 ..............................................................................9

50 C.F.R. § 223.206 ......................................................................10, 11

50 C.F.R. § 223.207 ............................................................................10

35 Fed. Reg. 18,309 (Dec. 2, 1970) ....................................................7

35 Fed. Reg. 8491 (Jun. 2, 1970) ........................................................7

43 Fed. Reg. 32,800 (Jul. 28, 1978) ....................................................7

85 Fed. Reg 43,304 (July 16, 2020) ..................................................38

86 Fed. Reg. 16,676 (Mar. 31, 2021) ................................................16

86 Fed. Reg. 20,475 (Apr. 20, 2021) ................................................46

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy Act |
| TED | Turtle Excluder Device |
| The Service | National Marine Fisheries Service |

## INTRODUCTION

Each year, thousands of sea turtles are unintentionally caught and drowned in shrimp trawls, making this the single largest source of human-caused mortality for these endangered and threatened species in the southeastern United States. To prevent captured turtles from drowning, the National Marine Fisheries Service (the Service) has required most, but not all, shrimp trawls to employ highly effective turtle excluder devices—more commonly known as TEDs—which are essentially escape hatches for captured turtles. The trawl types used in nearshore coastal waters, however, have been largely exempted from those requirements. These nearshore trawls catch and kill thousands of sea turtles each year, mostly Kemp's ridley sea turtles, which are the most critically endangered of the five sea turtle species found in U.S. waters.

The Service has long recognized the need to address the population-level risks from this significant source of mortality. After abandoning a 2012 rulemaking aimed at the problem, the Service finally proposed a rule in 2016 to require TEDs on nearly all shrimp trawls operating in nearshore waters to aid in the recovery of each of the sea turtle species. However, in the final rule published in 2019, the Service unexpectedly exempted several categories of shrimp trawl vessels from the TED requirements. As a result, the final rule covers less than one-fifth of the

1

vessels that would have been covered under the proposed rule and allows exempted trawlers to continue to kill more than 1,300 sea turtles each year.

The rule contains a particularly problematic exemption for small and moderate-length vessels using gear known as a skimmer trawl. This gear kills Kemp's ridley sea turtles in disproportionate numbers. The Service's recovery plan for the Kemp's ridley accordingly states that TEDs must be required on the skimmer trawl fishery for the species to recover. Yet the Service added a broad skimmer trawl exemption in the final rule based on stated reasons that lack any grounding in the record evidence. What is more, the Service sprung the new exemption for the moderate-length vessel category on the public for the first time in the final rule, with no prior notice or opportunity for comment, in violation of the Administrative Procedure Act's (APA) rulemaking requirements. And despite the rule's objective to aid in the recovery of individual sea turtle species, the Service never assessed or disclosed the action's effects on individual species in its National Environmental Policy Act (NEPA) analysis.

Consequently, well over a thousand sea turtles will continue to be killed in nearshore shrimp trawls each year due to an unsupported exemption that was promulgated without following the APA's rulemaking requirements. But the Service does not know how much of a problem that is for the five imperiled sea

2

turtle species because it did not assess the effects to each species as required by NEPA.

Plaintiffs-Appellants Conservation Groups challenged the final rule under the APA and NEPA. The District Court upheld the rule. Conservation Groups now appeal.

## STATEMENT OF JURISDICTION

The District Court had subject-matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) because the claims arose under the APA, 5 U.S.C. §§ 701–06, and NEPA, 42 U.S.C. § 4321 *et seq*. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Conservation Groups have Article III standing to seek relief from this Court, as demonstrated by the declarations of Peter Galvin, Kimber De Salvo, Elizabeth Fleming, Sharon Wilcox, and Ann Wiley filed in support of Conservation Groups' motion for summary judgment in the District Court. *See* JA052–92. Conservation Groups timely noticed this appeal on November 14, 2022, within 60 days of the District Court's issuance of its September 14, 2022 Order denying the Groups' motion for summary judgment and granting the Service's cross-motion for summary judgment. JA107, JA148; *see* Fed. R. App. P. 4(a)(1)(B). This appeal is from an order disposing of all parties' claims and a judgment rendered final. *See* Fed. R. Civ. P. 58(a).

3

## STATEMENT OF THE ISSUES

(1) Did the Service violate the APA by justifying the final rule's exemption for moderate-length skimmer trawl vessels on grounds that are unsupported by and counter to the record evidence?

(2) Did the Service violate the APA by creating an exemption for a new category of vessels in the final rule without providing the public any prior notice or opportunity to comment on the exemption?

(3) Did the Service violate NEPA by failing to evaluate the rule's impacts to individual sea turtle species when the rule was aimed at reducing impacts to individual sea turtle species?

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are reproduced in the Addendum bound with this brief.

## STATEMENT OF THE CASE

**I.**     <u>**Southeastern U.S. Waters Are Home to Five Imperiled Sea Turtle Species.**</u>

Sea turtles are ancient reptiles that have inhabited the oceans for millions of years. JA150. Sea turtles are highly migratory and travel thousands of miles between the habitats where they are born, forage, and reproduce. *E.g.*, JA334, JA353–54. Females come ashore to lay eggs on sandy beaches, often the same beaches where they were born. *E.g.*, JA336, JA344. Hatchlings emerge from those

nests, crawl to the ocean, and swim to open water where they are swept into ocean currents. JA344. As they grow larger, sea turtles head to their preferred feeding grounds, which differ among species. JA334–37, JA341, JA344, JA350, JA353–54. Individual sea turtles typically exhibit fidelity to their foraging areas, returning to the same places year after year. *E.g.*, JA337, JA155–56.

There are seven species of sea turtles in the world, five of which are found in U.S. coastal waters in the Gulf of Mexico and Atlantic Ocean: the Kemp's ridley, green, loggerhead, leatherback, and hawksbill sea turtles. JA333, JA266a. Tragically, commercial fishing and other human activities have decimated these species' populations. JA319–20, JA355. The Kemp's ridley—of particular concern in this case—has suffered the worst declines and is now the most critically endangered sea turtle species in the world. JA343.

Unique among the sea turtles in U.S. waters, the Kemp's ridley is "predominantly a coastal species," inhabiting shallow, nearshore waters of the northern Gulf of Mexico for most of its life stages. JA373; *see also* JA344. Adults typically are found in water depths less than 30 feet, while juveniles use shallower waters less than 16 feet deep. *See* JA206 (fig.3), JA373. Female Kemp's ridleys come ashore to lay their eggs in large, synchronized aggregations known as arribadas, which occur primarily on a single beach in the western Gulf. JA345, JA347. After hatching and entering the ocean, young Kemp's ridleys move to the

Gulf of Mexico's deeper oceanic waters, with some continuing to the northwest Atlantic. JA169–71. As juveniles grow larger, they settle into nearshore environments in the Gulf and Atlantic. JA171–74. By their adult stage, Kemp's ridleys live primarily in the Gulf of Mexico where they reproduce and nest. JA175.

The Kemp's ridley's limited range and low population make it particularly vulnerable to extinction. JA346. Scientists estimate that between 1947 and 1985, the species experienced a 99% drop in nesting numbers at its predominant nesting site. JA168, JA151. The species almost went extinct in the 1980s due to overexploitation and capture in fishing gear. JA152–54. The population has slowly increased since then, likely due to a combination of regulatory protections (including nest protection, fisheries capture mitigation, and elimination of direct harvest) and reduced fishing effort in Mexico and the United States. JA346. But further management measures are necessary to recover the species. JA166–67.

Populations of the four other sea turtle species found in southeastern U.S. waters also are at a fraction of their historical levels. JA319–20. These species are more widely distributed throughout several water bodies and often inhabit deeper waters than Kemp's ridleys. *See* JA334–36, JA338, JA339–40, JA349–50, JA351–53.

## II.    <u>Mortality in Shrimp Fisheries Puts Sea Turtles in Danger of Extinction.</u>

The Service and the U.S. Fish and Wildlife Service recognized the risk of extinction for all five sea turtle species decades ago and protected each as threatened or endangered under the Endangered Species Act (ESA). 43 Fed. Reg. 32,800 (Jul. 28, 1978) (listing loggerhead and green sea turtles as threatened); 35 Fed. Reg. 18,309 (Dec. 2, 1970) (listing Kemp's ridley sea turtle as endangered); 35 Fed. Reg. 8491 (Jun. 2, 1970) (listing hawksbill and leatherback sea turtles as endangered). But despite decades of statutory protection, all five species remain at risk of extinction and are struggling to recover. JA160, JA162–63, JA187, JA189, JA204.

Sea turtles face many threats, JA319–20, but incidental catch from commercial fishing, known as bycatch, is one of the most serious impediments to their recovery, *e.g.*, JA355–56. Of all the fisheries in the United States, the Service has determined that shrimp trawling is the *most* detrimental to the recovery of sea turtle populations. JA158; *see also* JA495.

Trawling involves towing nets through the water, which can incidentally catch and kill sea turtles. JA392. Sea turtles must surface to breathe, and a captured turtle may drown due to prolonged, forced submergence in nets. *Id.* Those that survive frequently suffer harmful physiological effects, including the buildup of acid in their lungs and muscles, and become susceptible to delayed death,

7

predation, boat strikes, and other sources of injury and death. JA357, JA392. Even turtles that appear to be in good health after capture often die following their release. JA428. Without sufficient mitigation, shrimp trawling will continue to be one of the most significant threats to sea turtles. *See, e.g.*, JA205.

The southeastern U.S. shrimp fisheries operate in nearshore and offshore waters from Texas through North Carolina. JA331. There are several different types of shrimp trawl gear. Trawlers fishing in deeper offshore waters primarily use otter trawls, which consist of a large net bag with boards at each side that hold the net open as it is towed through the water column. JA321, JA326, JA358. Trawlers fishing in shallower, nearshore waters primarily use skimmer trawls—the main gear at issue in this case—which are similar to otter trawls but are held open by a frame that holds them higher in the water column. JA320–21, JA328–29. Almost all skimmer trawl vessels operate out of Louisiana, with others in Mississippi, Alabama, North Carolina, and to a limited extent, Florida. JA320, JA329–31. The Service estimates skimmer trawls incidentally kill between 1,624 and 2,348 sea turtles every year. JA369. Different size skimmer trawl vessels pose different degrees of risk to sea turtles based on where they fish: small skimmer trawl vessels under 26 feet in length operate in shallow inshore bays and lakes just 4 to 5 feet deep where turtles are less abundant, while larger skimmer trawl vessels

over 26 feet in length fish in water approximately 8 feet and deeper where Kemp's

ridleys, in particular, tend to forage. JA309, JA366, JA206.

## III.    **TEDs are Proven, Effective Tools to Prevent Sea Turtle Bycatch Deaths.**

The Service is charged with protecting and ensuring the recovery of sea

turtles under the ESA. *See* JA319; 16 U.S.C. §§ 1531(b), 1533(f), 1536(a)(1); *see*

*also* 16 U.S.C. § 1532(3) (defining "conservation" as using "all methods and

procedures" necessary to ensure species' recovery). Congress enacted the ESA

with the intention "to halt and reverse the trend toward species extinction,

whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). Among

other requirements, the ESA makes it unlawful for any person to "take" any

endangered or threatened sea turtle, which includes harming, capturing, or killing.

16 U.S.C. §§ 1532(19), 1538(a)(1)(B), (G); 50 C.F.R. § 223.205(a).[1] However, the

Service may authorize certain take that is "incidental" to a lawful activity, subject

to specified terms and conditions. 16 U.S.C. § 1539(a)(1)(B).

Shrimp trawlers take sea turtles by capturing, injuring, and killing them in

trawl nets. JA392. In 1987, the Service issued regulations authorizing incidental

sea turtle take by most shrimp trawlers in the southeastern U.S. only if they "have

an approved TED installed in each net that is rigged for fishing." 50 C.F.R.

---

[1] Unless otherwise indicated, all Code of Federal Regulations citations are to the current edition.

§ 223.206(d)(2) (2018); *see* JA393, JA394. TEDs are metal grids that are attached to the inside of trawl nets with an escape hatch that allows captured turtles to safely exit. JA311. TEDs must be at least 97% effective at releasing sea turtles by law, ensuring that very few turtles captured in nets with TEDs will die or suffer significant injury. *See* 50 C.F.R. § 223.207(e)(1); JA311. At the same time, TEDs have minimal impact on shrimp catch. JA245 (finding about 95% of shrimp catch is retained). The use of TEDs on shrimp trawl nets has been instrumental in reducing sea turtle deaths in the fishery. *E.g.*, JA176 (finding 50% reduction in sea turtle death corresponding with more widespread use of TEDs).

The Service, however, had long excluded a subset of shrimp trawlers using certain gear types—skimmer trawls, pusher-head trawls, and wing nets—from TED requirements based on a dated assumption that these gear types do not pose a threat to sea turtles. JA310. The Service reasoned that unlike other shrimp trawlers, these vessels tow their nets through the water for short enough time periods that any incidentally caught turtles could be released by the crew before drowning. JA181. The Service accordingly set tow time limits of 55 or 75 minutes, depending on the season, for these gear types in lieu of requiring TEDs. JA395; 50 C.F.R. § 223.206(d)(2)(ii)(A)(3), (d)(3)(i) (2018).

IV.  **Tow Time Limits Are Ineffective and Inadequate at Protecting Sea Turtles.**

The Service's assumption about the efficacy of tow time limits has proven unfounded. Decades of scientific evidence and enforcement data demonstrate that tow time restrictions fail to effectively protect sea turtles. JA255, JA164. Shrimp trawlers subject to the tow time limits are estimated to kill nearly 3,000 sea turtles every year. JA408. Observational data show that most trawlers do not comply with the limits, towing their nets through the water far longer than captured turtles can survive. JA321; *see* JA201 (noting compliance less than 20% in 2013). And the limits are nearly impossible to enforce: to catch a violator, law enforcement agents must observe active shrimp trawling in the open water for more than the approximately hour-long tow time limit without being detected by the vessel operator. JA217–18; *see also* JA255.

The Service has long known it must remove the regulatory tow time loophole and require TEDs on *all* shrimp trawls to protect sea turtle populations, especially the Kemp's ridley. *See, e.g.*, JA180 (describing efforts dating back to 2009). In 2011, the Service recognized skimmer trawls as a particularly "significant mortality threat" to the Kemp's ridley. JA405 (citing JA178). It subsequently attributed two Kemp's ridley mass mortality events in 2010 and 2011 to capture in "the inshore skimmer trawl fisheries." JA184; *see* JA347–48. Skimmer trawls catch Kemp's ridley turtles in disproportionate numbers because

11

the species forages primarily in the shallower, nearshore habitats where skimmer trawls fish. JA203, JA205. The species' 2011 Recovery Plan accordingly listed requiring TEDs on "all trawl fisheries of concern," including skimmer trawl fisheries, as a necessary action. JA177. More recently, the Kemp's Ridley Recovery Team—which includes the Service—identified "requir[ing] TEDs in U.S. skimmer trawl fisheries" as one of the four "*most critical actions*" that needs to be taken for the species' recovery. JA199–200.

Nonetheless, the Service has continually resisted requiring TEDs on skimmer trawls over the last decade, prompting multiple lawsuits. In 2011, a coalition including Conservation Groups sued the Service for failing to address the need for expanded TED requirements in the southeastern U.S. shrimp fisheries. Compl., *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, No. 1:11-cv-01813-ABJ (D.D.C. Oct. 13, 2011). The parties settled after the Service agreed *inter alia* to issue a proposed rule that would address sea turtle mortality in skimmer trawls. Settlement Agreement & Stip. Dismissal, *Turtle Island*, No. 1:11-cv-01813-ABJ (D.D.C. Apr. 26, 2012). The Service subsequently proposed a rule in 2012 to remove the tow time exception and require TEDs on all commercial shrimp trawlers using skimmer trawls, pusher-head trawls, and wing nets in the southeastern U.S. shrimp fisheries. JA179. But a year later, the Service withdrew the proposal in part because it needed to better address skimmer trawls' high

capture rates of smaller-sized Kemp's ridley sea turtles, which then-existing TED technology was poor at preventing. JA183–85; *see* JA193. While TED designs improved to address the small-turtle problem, JA255, no further rulemaking occurred until another conservation organization's lawsuit in 2015 prompted the Service to once again commit to propose a rule requiring TEDs on skimmer trawls, pusher-head trawls, and wing nets, *see* Stip. Agreement & Mot. Stay Case 2–3, *Oceana v. Pritzker*, No. 1:15-cv-00555-PLF (D.D.C. Sept. 7, 2016). The rulemaking at issue here followed.

## V.    The Service Proposes Requiring TEDs on Nearly All Shrimp Trawl Vessels.

In 2016, the Service issued a proposed rule to require TEDs designed to account for smaller turtles on all commercial shrimp trawlers using skimmer trawls, pusher-head trawls, and wing nets (except those in the Biscayne Bay fishery). JA254. The Service intended the rule "to adequately protect, conserve, and recover sea turtle populations listed under the ESA by reducing incidental bycatch and mortality of sea turtles, particularly smaller sea turtles more common in coastal waters." JA215 (citation omitted); *accord* JA254; *see also* JA252 (stating proposed "requirements are designed specifically to help exclude small sea turtles that occur in shallow (e.g., < 60 feet in depth), coastal waters"). The focus on smaller sea turtles was aimed mainly at small Kemp's ridleys, which tend to be most abundant in the shallow waters where skimmer trawls fish. JA184, JA240–

41; *see* JA255 (expressing concern about juvenile Kemp's ridley sea turtles). The Service estimated the proposed rule would save up to 2,500 sea turtles every year, reducing the current mortality rate in the southeastern U.S. shrimp fisheries by more than 80%. JA209, JA256.

While proposing to require TEDs for essentially all trawlers using the three gear types, the Service also considered alternatives that would exempt certain categories from the new TED requirements, specifically vessels using pusher-head trawls or wing nets, and/or "small" vessels (identified as those "less than 26 ft in length") using skimmer trawls. JA221–24, JA259. The Service explained each of those categories has unique data limitations and operational issues that might warrant different treatment. JA221–24. For example, the Service lacked TED testing data and fishery observer information to make definitive conclusions about TED efficacy on those categories. *Id.* And vessels under 26 feet may have difficulty safely deploying and storing TEDs due to their particularly small size. *Id.* Nonetheless, the Service decided not to exempt those categories from the proposed rule because the exemptions would "result in less protection of sea turtles." JA259.

## VI.    <u>The Service Creates a Broad Exemption for Several Categories of Shrimp Trawl Vessels in the Final Rule.</u>

The Service did not issue a final TED rule until December 2019. JA426. The final rule slashes the number of vessels subject to TED requirements by more than 80% from the original proposal. JA314 (tbl.1). The Service chose to exempt the

wing net, pusher-head trawl, and small skimmer trawl vessel categories contemplated in the proposed rule *and* added an entirely new exemption for moderate-length skimmer trawl vessels 26 to 40 feet in length. JA427.[2] The Service stated in the final rule that it exempted wing nets and pusher-head trawls due to "concerns about applying TED testing data from skimmer trawl operations" to those categories, "coupled with a lack of observer data for these vessels." *Id*. The Service stated its exemption for small and moderate-length skimmer trawl vessels up to 40 feet was "[b]ased on public comment raising performance and safety issues with TED use on smaller vessels and regarding the economic impacts of the proposed rule, and new information indicating significantly lower levels of sea turtle mortality in the offshore fleet." *Id.* Despite exempting more than 80% of skimmer trawl vessels (4,370 of 5,432) from the final rule, JA374, the Service claimed the rule implements the Kemp's Ridley Recovery Team's "most critical recovery action[]" of "requiring TEDs in the skimmer trawl fisheries." JA432. The

---

[2] This brief uses "small" in reference to vessels under 26 feet and "moderate-length" in reference to vessels 26 to 40 feet. *See* JA324 ("small vessels (i.e., less than 26 ft in length)"), JA365–66 (referring to "small" vessels as those under 26 feet and "moderate-length skimmer trawl vessels" as the next largest size class over 26 feet); *cf.* 46 C.F.R. § 24.10-1 (Coast Guard definition of "motorboat" deeming vessels under 26 and between 26 and 40 feet to be different vessel "length categories").

Service provided no public notice or opportunity to comment on the expanded skimmer trawl exemption before publishing the final rule.

Pursuant to NEPA, the Service issued a final environmental impact statement (EIS) with the rule that includes mortality estimates for sea turtles in the aggregate, but does not evaluate the effects on individual sea turtle species. *See* JA362–75. The Service estimates the final rule will result in twice as many sea turtle deaths each year (1,364–1,766) as would have occurred under the proposed rule. *See* JA314 (tbl.I). Compared to even the least protective alternative (exempting wing nets, pusher-head trawls, and small skimmer trawl vessels) considered at the proposed rule stage, the addition of the moderate-length skimmer trawl vessel exemption *alone* is expected to result in 930 to 1,342 more sea turtle deaths each year. JA386.

The rule was set to be effective on April 1, 2021, which the Service subsequently delayed to August 1, 2021. JA426; 86 Fed. Reg. 16,676 (Mar. 31, 2021).

## VII.  **Procedural History.**

On April 6, 2021, Conservation Groups filed this case in the District Court challenging the final TED rule under the APA and NEPA. JA009–51.[3] The District

---

[3] The complaint also included a claim under the ESA, which Conservation Groups opted not to pursue on the merits.

Court denied summary judgment for Conservation Groups and granted summary judgment for the Service on all claims. JA107, JA108–47. Conservation Groups timely appealed. JA148.

In a later-filed case, the State of Louisiana challenged the final TED rule in the U.S. District Court for the Eastern District of Louisiana as arbitrary and capricious and in violation of the Constitution's Commerce Clause. Compl., *Louisiana v. Dep't of Com.*, Civ. A. No. 21-01523 (E.D. La. Aug. 11, 2021). After preliminarily enjoining the rule in Louisiana inshore waters until February 1, 2022, due to issues with public notice of the rule's effective date, the court dismissed the case for lack of standing; Louisiana has appealed. *Louisiana v. Dep't of Com.*, No. 21-01523, 2022 WL 17251152 (E.D. La. Dec. 19, 2022), *appeal docketed sub nom. Louisiana State v. Nat'l Oceanic & Atmospheric Admin.*, No. 22-30799 (5th Cir. Dec. 20, 2022).

## SUMMARY OF ARGUMENT

1.      The Service violated the APA by justifying the final rule's exemption for moderate-length skimmer trawl vessels on two grounds that are unsupported by and counter to the record evidence. *First*, the Service cited safety and performance concerns as a basis for exempting skimmer trawl vessels up to 40 feet in length, but the record indicates those concerns apply only to small vessels under 26 feet. The Service cannot use concerns specifically applicable to small skimmer trawl

vessels to also exempt moderate-length skimmer trawl vessels 26 to 40 feet in length, absent any record evidence the concerns apply to both categories. *Second*, the Service cited new information on sea turtle mortality in the offshore shrimp fleet as a basis for creating the broad skimmer trawl exemption from the proposed rule. But the information supports a *stronger* need for TED requirements on all skimmer trawls than understood at the proposed rule stage. The Service cannot use the new information to justify weakening TED requirements for skimmer trawls with a new broad exemption.

2.      The Service violated the APA by creating a new exemption for moderate-length skimmer trawl vessels in the final rule without providing the public any prior notice or opportunity to comment on the exemption. The proposed rule listed specific categories of vessels contemplated for exemption from the final rule. It did not list moderate-length skimmer trawl vessels or provide any other indication that the Service was contemplating broadening the vessel categories for exemption. The new exemption therefore is not a logical outgrowth of the proposed rule, in violation of the APA. The violation prejudiced Conservation Groups by depriving them of an opportunity to comment on the exemption.

3.      The Service violated NEPA by failing to evaluate the rule's impacts to individual sea turtle species. The rulemaking was aimed at reducing impacts to individual sea turtle species and aiding in their recovery, with a focus on the

critically endangered Kemp's ridley sea turtle. Species-specific differences in habitat use and baseline populations mean the rule and its alternatives will impact each of the five sea turtle species in southeastern U.S. waters differently. However, the Service only assessed effects of the rule and its alternatives to "sea turtles" as a generic group, without any quantitative or qualitative evaluation of the distinct impacts to any individual species. As a result, the Service failed to disclose the impacts of its action and was not fully informed about effects to make a reasoned choice among alternatives.

4.      The Court should remand the TED rule and final EIS without vacatur and impose a one-year deadline to complete the remand, given the Service's decade-long history of delay in promulgating necessary TED requirements for nearshore shrimp trawls.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment. *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011). The Court reviews the Service's compliance with NEPA under the APA. *Id.* The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision is arbitrary and capricious if an agency fails to "examine the relevant data and

articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (citation omitted).

## ARGUMENT

I.  **The Service Violated the APA By Justifying the Final Rule's Exemption for Moderate-Length Skimmer Trawl Vessels on Grounds that Are Unsupported by and Counter to the Record Evidence.**

A rule that relies on one or more grounds that are unsupported or belied by the record violates the APA. The Service stated it exempted skimmer trawl vessels up to 40 feet in length from the final rule based on safety and performance concerns and new information about turtle mortality in the offshore shrimp fleet. The record does not indicate any safety or performance concerns for the category of skimmer trawl vessels larger than 26 feet (i.e., 26- to 40-foot moderate-length vessels). And the record shows the new mortality information supports *stronger*, not weaker, skimmer trawl TED requirements. The Service's stated reasons cannot sustain the final rule's exemption for moderate-length skimmer trawl vessels—estimated to result in 930 to 1,312 avoidable sea turtle deaths annually—under the APA.

The APA requires an agency to provide "a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (cleaned up). This standard requires that an agency's stated grounds for a final rule be adequately

justified and supported by the record evidence. *Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 432 (D.C. Cir. 2018) (finding rule arbitrary when there was "no evidence in the record supporting the [agency's] assumption" on which rule was based); *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016) (stating agency "had a duty here to . . . justify the 'key assumptions' underlying its decision" (citation omitted)), *on reh'g en banc in part*, 671 F. App'x 824 (D.C. Cir. 2016); *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 328 (D.C. Cir. 2006) (finding action arbitrary when stated "rationale . . . is not supported by any reasoned analysis" in the record). When "the administrative record belies the [agency's] stated reason for its . . . approach," a rule must be found "unreasoned, arbitrary, and capricious." *Util. Solid Waste*, 901 F.3d at 434; *see also State Farm*, 463 U.S. at 43 (stating action is arbitrary and capricious if agency has "offered an explanation for its decision that runs counter to the evidence before the agency"). "Where [an agency] rests a decision, *at least in part*, on an infirm ground, [the court] will find the decision arbitrary and capricious." *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021) (emphasis added); *accord Williams Gas*, 475 F.3d at 330.

The Service expressly rested its decision to exempt moderate-length skimmer trawl vessels at least in part on two grounds that are unsupported by and counter to the record: 1) "public comment raising performance and safety issues

with TED use on smaller vessels" and 2) "new information indicating significantly

lower levels of sea turtle mortality in the offshore fleet." JA427 (final rule section

explaining "Changes From the Proposed Rule"); *see also* JA433, JA434, JA436

(relying on same grounds to justify exemption). Neither has any record support as

a basis for the moderate-length skimmer trawl vessel exemption.

A.    The Safety and Performance Ground for Exempting Moderate-Length
        Skimmer Trawl Vessels Is Belied by the Record.

The Service's use of safety and performance concerns to justify exempting

not only small but also moderate-length skimmer trawl vessels runs counter to the

record evidence. The record repeatedly indicates that the cited concerns apply only

to small skimmer trawl vessels under 26 feet. *Every* safety or performance concern

articulated in the final rule is expressly limited to vessels under 26 feet: 1) a lack of

"observer data on skimmer trawl vessels less than 26 feet"; 2) a lack of "TED

testing information on skimmer trawl vessels less than 25 feet in length"; 3)

concerns that "skimmer trawl vessels less than 26 feet in length" lack the "ability

to adequately install TEDs in the nets . . . without significant modifications to

vessel rigging" and have "the potential lack of deck space to accommodate TEDs";

4) a concern that "very small vessels, such as skiffs 18 feet in length for example,

[have] limited space to sort catch and handle gear"; and 5) a concern that "TEDs

installed on vessels less than 26 feet in length . . . could interfere with the engine

while maneuvering a small vessel . . . , presenting a potential safety issue." JA440.

The Service's decision memorandum for the final rule also highlights the limited scope of the performance- and safety-related "operational concerns" motivating the addition of the skimmer trawl exemption as concerning only "small vessels (e.g., less than 25–26 feet in length)." JA305–06; *see also* JA493 (Congressional report on final rule stating the same). And the final EIS describes only safety concerns unique to vessels under 26 feet. JA324, JA332, JA378, JA379, JA383, JA384, JA391; *cf.* JA325 ("Vessels between 26 and 30 ft . . . have enough deck space to accommodate TED storage."). Conversely, "[t]here is no evidence in the record" identifying safety or performance concerns with TED use on skimmer trawl vessels larger than 26 feet. *Util. Solid Waste*, 901 F.3d at 432.

Fundamentally, the record shows that small vessels are operationally different from moderate-length vessels in meaningful ways, including vessel rigging, deck space, and maneuverability—akin to how a semi-truck has different operational considerations than a shorter moving van. And it shows that 26 feet has operational significance as the delineation point for safety and performance concerns with TED use: small vessels under 26 feet have those concerns, and moderate-length and larger vessels over 26 feet do not.

In part for that reason, the Service had developed two alternatives— Alternatives 2 and 4—in the draft EIS to exempt skimmer trawl vessels under 26 feet, which it termed "small vessels." JA221–23. The Service explained that the

limited exemption for vessels under 26 feet addresses "safety at sea" issues identified for small vessels. JA221.

The public comments on the proposed rule and draft EIS do not identify any safety or performance concerns with TED use on vessels over 26 feet. *Every* comment that the Service cited in the District Court to support the final rule's safety rationale either lists a vessel length less than 26 feet, refers to "small" vessels, or does not mention vessel size. *See* JA093–95 (citing, *e.g.*, JA262 (concerns for 17' boat), JA263 (concerns for 19' boat)). No comment cited by the Service—in the final rule or the District Court—describes safety or performance concerns with a vessel larger than 26 feet.[4]

After considering the public comments, the Service produced a final EIS that reiterates that a limited exemption for vessels under 26 feet addresses identified "safety at sea issues" with small vessels. JA324. The Service also signed a record of decision for a final rule that would exempt only skimmer trawl vessels under 26

---

[4] The final rule invokes a comment allegedly suggesting an exemption for vessels up to 40 feet in length. JA436. But the comment itself appears nowhere in the record so cannot be confirmed. *See* AR002162−9400 (certified compilation of "Comments received during the December 16, 2016 - February 14, 2017, public comment period"); *Flyers Rts. Educ. Fund, Inc. v. Fed. Aviation Admin.*, 864 F.3d 738, 746 (D.C. Cir. 2017) (stating agency may not rely on "declaration of fact" that "is unsupported by any evidence" in record (citation omitted)). Even assuming the comment existed, the record contains no indication that any rationale was offered for the 40-foot suggestion, much less any safety or performance concerns.

feet (as well as wing net and pusher-head trawls), determining that the safety and performance concerns raised during comments justify such a limited exemption. JA420–22.[5] However, in the final rule itself, the Service used those same safety and performance concerns to justify exempting not only small vessels under 26 feet, but also moderate-length vessels. That is, the Service arbitrarily exempted moderate-length skimmer trawl vessels based on operational issues that apply only to small skimmer trawl vessels, with *no* evidence the larger trawler category has the same constraints. *See Util. Solid Waste*, 901 F.3d at 432–34 (finding EPA's stated reason for exempting legacy ponds from regulation unsupported by record).

This Circuit rejected as arbitrary a similar attempt to use concerns applicable to one category to justify exempting an additional category in *U.S. Sugar*. 830 F.3d at 647–52. There, the Environmental Protection Agency had proposed exempting so-called natural area source boilers from permit requirements based on evidence

---

[5] After this case began, the Service submitted a litigation affidavit asserting the record of decision was a "draft" that had been signed by mistake. JA499. The Service supplemented the administrative record with a new record of decision signed September 3, 2021—nearly two years after the final rule's publication— selecting the broader 40-foot skimmer trawl exemption based on the same grounds stated in the final rule. JA501–11. The litigation affidavit, the belated record of decision, and the *post hoc* rationalizations contained therein are not properly before the Court and should be disregarded. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908–09 (2020). In any event, the new record of decision did not alter the "draft" record of decision's rationale that the safety concerns support a limited exemption for vessels under 26 feet. *See* JA507.

that the requirements would be "unnecessarily burdensome" to that group of sources. *Id.* at 647. But in the final rule, the agency extended the exemption to include synthetic area boilers on the basis that they are "similar in size and sophistication" to natural area boilers so would also face an unnecessary burden. *Id.* at 649. The court held the new exemption arbitrary because the agency failed to "explain why the rationale it used to exempt natural area sources . . . could be identically applied to synthetic area sources" and failed to provide data in support of its stated rationale. *Id.* at 650–51. The Service's decision here is equally arbitrary: it cannot use concerns specifically applicable to skimmer trawl vessels under 26 feet to also exempt moderate-length skimmer trawl vessels absent any evidence the concerns with the former apply to the latter. *See also, e.g.*, *Regents of Univ. of Cal.*, 140 S. Ct. at 1912–13 (holding reason supporting rescinding one aspect of Deferred Action for Childhood Arrivals policy cannot be used to justify rescinding a different aspect); *State Farm*, 463 U.S. at 47 (holding reason supporting repeal of automatic seatbelt requirement could not be used to justify also repealing air bag requirement). The safety and performance ground for exempting moderate-length skimmer trawl vessels lacks a rational connection to the record evidence.

B.    Underline New Information on Mortality in the Offshore Fleet Undercuts the Broad Skimmer Trawl Exemption.

The Service's claim that new information about bycatch in the offshore fleet justifies exempting skimmer trawl vessels up to 40 feet also runs counter to the record evidence. As an initial matter, the final rule is not entirely clear on what the new information is or why the Service thought it relevant, making it difficult for "the court to determine whether [agency's] judgment reflects reasoned decisionmaking." *Tripoli Rocketry Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 437 F.3d 75, 81 (D.C. Cir. 2006). The Service stated in the District Court that the information pertains to otter trawls, which are an entirely different gear type used in deeper waters than skimmer trawls and are not implicated by this rulemaking. JA099–100 (citing JA225, JA326). The information accordingly says nothing about sea turtle mortality rates in skimmer trawls; it in no way suggests skimmer trawls are less harmful than understood when the Service decided not to exempt any skimmer trawls in the proposed rule. *Compare* JA209, *with* JA313–14 (showing no change in skimmer trawl mortality estimates between draft and final EIS); *see Catawba Cnty. v. EPA*, 571 F.3d 20, 51−52 (D.C. Cir. 2009) (finding agency's changed rationale between initial and final designations "not justified" when there was "no apparent change in data"). So the information cannot reasonably justify reducing skimmer trawl TED requirements in the final rule.

On the contrary, other portions of the final rule indicate that the information weighs *against* making the change. The final rule states the new information obtained after the proposed rule "further supports the need for sea turtle conservation in the skimmer trawl fisheries." JA432. Relying on that new information to instead *reduce* sea turtle conservation in the skimmer trawl fisheries from the proposed rule by adding a broad exemption is directly "counter to the evidence before the agency," *State Farm*, 463 U.S. at 43; at best, it is an "unexplained inconsistenc[y] in the final rule," *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015). In the District Court, the Service initially defended its reliance on the new information for the exemption in its opening brief before reversing course in its reply to claim the information had no bearing on the decision to exempt skimmer trawl vessels up to 40 feet. *Compare* JA096, JA097, *with* JA100. While the Service's *post hoc* disavowal of the new information contradicts the final rule's express reliance on that information as a basis for the "changes" from the proposed rule, JA427, it is effectively also an admission that there is no "rational connection" between the stated new information ground and the choice to exempt skimmer trawls in the final rule, *see State Farm*, 463 U.S. at 43.

C.     Resting the Final Rule on Two Invalid Grounds Is Arbitrary and Capricious.

The final rule adopting a broad skimmer trawl exemption is arbitrary and capricious because the Service rested the exemption, "at least in part, on [two] infirm ground[s]" that lack a rational connection between the evidence and the exemption. *Vecinos*, 6 F.4th at 1331; *Williams Gas*, 475 F.3d at 330. The rule expressly and repeatedly relies on both the safety and performance concerns and new information as grounds for exempting small and moderate-length skimmer trawl vessels. *E.g.*, JA427 (stating exemption of skimmer trawl vessels up to 40 feet was "[b]ased on" these grounds), JA433 (stating "comments raising safety and other practical concerns about using TEDs on small skimmer trawls factored into the decision" to exempt skimmer trawl vessels up to 40 feet), JA434 (citing "potential safety issues" for exemption of "skimmer trawl vessels less than 40 feet"). And in the District Court, the Service affirmed that it "establish[ed] a vessel size threshold larger than the 26-foot threshold" for the exemption—that it "revised the threshold" to add the moderate-length vessel category—"[b]ased on" performance and safety issues and new mortality information. JA096 (quoting JA427); *see also* JA093–94 (stating Service "change[d] the vessel size threshold . . . based on comments" concerning "the practicality of employing TEDs on small skimmer vessels"), JA096a (stating "selection of the 40-foot vessel size" was "based on" safety concerns), JA097 (stating Service "partially relied on [the new

29

mortality information] to develop" the expanded exemption). The disconnect between the record evidence and the stated grounds for the moderate-length skimmer trawl vessel exemption render the exemption arbitrary and capricious.

The District Court asked the wrong question when assessing this issue: whether the Service offered *any* explanation for its "decision to extend the TED requirements only to skimmer trawls longer than 40 feet." JA137–140. However, the issue is not whether the Service provided an explanation that could be reasonable in theory, but whether the grounds in the proffered explanation are supported by the record. *See BellSouth Corp. v. Fed. Commc'ns Comm'n*, 162 F.3d 1215, 1222 (D.C. Cir. 1999) ("Where the agency has failed to provide a reasoned explanation, *or* where the record belies the agency's conclusion, we must undo its action." (emphasis added)); *see also U.S. Sugar Corp.*, 830 F.3d at 650 (finding justification for rule unsupported); *Williams Gas*, 475 F.3d at 328 (finding action arbitrary where "rationale . . . is not supported by any reasoned analysis" in the record). "Because the administrative record belies the [Service's] stated reason for" exempting moderate-length skimmer trawl vessels, the "exemption is unreasoned, arbitrary, and capricious." *Util. Solid Waste*, 901 F.3d at 434.

## II.    **The Service Violated the APA by Creating an Exemption for a New Category of Vessels in the Final Rule Without Providing the Public Prior Notice or Opportunity to Comment.**

A final rule violates the APA when it includes a substantial change from the proposed rule with insufficient prior notice the change was contemplated to allow a meaningful opportunity for public comment on the change. The proposed TED rule indicated the Service was contemplating exempting only specified vessel categories from TED requirements. The final rule created an exemption for an entirely new vessel category—moderate-length skimmer trawl vessels—with no prior public notice of the exemption or opportunity to comment on it, in violation of the APA.

Under the APA, "an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). The logical outgrowth requirement serves to ensure the public has adequate notice and "an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). A final rule is a logical outgrowth of the proposed rule only "if interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079–80 (D.C. Cir. 2009) (cleaned up). This standard is met

31

"where the [proposed rule] expressly asked for comments on a particular issue or otherwise made clear that the agency was contemplating a particular change." *Id.* at 1081. "By contrast, a final rule fails the logical outgrowth test and thus violates the APA's notice requirement where interested parties would have had to divine the agency's unspoken thoughts, because the final rule was surprisingly distant from the proposed rule." *Id.* at 1080 (cleaned up). The touchstone is ultimately whether the proposed rule gave sufficient "indication that the agency was considering a different approach." *Id.* at 1081. Courts "apply th[e] standard functionally by asking whether the purposes of notice and comment have been adequately served, that is, whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994) (cleaned up).

The proposed TED rule gave no indication the Service was considering an exemption for moderate-length skimmer trawl vessels. It neither expressly asked for comments on such an exemption nor otherwise made clear that the Service was contemplating it. In contrast, the proposed rule specified the vessel categories that the Service *was* considering for exemption: wing nets in Biscayne Bay only, wing nets generally, pusher-head trawls, and/or small skimmer trawl vessels under 26 feet. JA259–60. Moderate-length skimmer trawl vessels were absent from the list.

*See Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983) ("Agency notice must describe the range of alternatives being considered with reasonable specificity."). The Service also indicated it considered the listed exemptions to already be too broad because they "result in less protection of sea turtles." JA259. There was no reason commenters should have anticipated the Service might develop and adopt an even broader *additional* exemption for moderate-length skimmer trawl vessels.

The absence of any notice regarding the new exemption violates the logical outgrowth test. *CSX Transp.*, 584 F.3d at 1081–82. This Circuit found a violation under similar circumstances in *CSX Transportation*, where a proposed rule indicated rail rate disputes would be settled using one year of data, but the final rule expanded the scope to include four years of data. *Id.* at 1078. The court held that even if "the final rule did not amount to a complete turnaround from" the proposed rule, it failed the logical outgrowth test because the proposed rule "nowhere even hinted that the Board might consider *expanding* the number of years" of data beyond one. *Id.* at 1081–82 (emphasis added); *see also, e.g.*, *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) (finding no logical outgrowth because proposed rule "makes no mention of the possible creation of administrative exemptions to CERCLA's reporting requirement" in the final rule).

Likewise, here, the Service nowhere even hinted that it might consider expanding the exemptions beyond those indicated in the proposed rule.

The District Court erred by concluding the final rule was a logical outgrowth simply because the proposed rule "used vessel length as a metric" to define the small skimmer trawl vessel category considered for exemption. JA141–42. But defining small vessels in feet gave no notice the Service would additionally exempt larger vessels. The *CSX Transportation* court rejected a similar contention: "that the mere mention of the release of one-year data for comparison groups gave notice that the *amount* of data available for that purpose might change." 584 F.3d at 1082 (emphasis added). Without also indicating that the agency was contemplating *changing* the delineation point—i.e., the amount of data in *CSX Transportation* or the vessel length for the exemption here—there was "no way that commenters . . . could have anticipated which particular aspects of the [agency's] proposal were open for consideration." *Id.* (cleaned up); *see also Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1116 (D.C. Cir. 2019) (finding logical outgrowth test failed where proposed rule would exclude cities with populations over 10,000 but final rule excluded cities with populations over 25,000); *Small Refiner*, 705 F.2d at 549 (finding notice that agency "might make unspecified changes in the definition of small refinery" insufficient to provide notice of how definition might change). Finding a proposed rule's mere mention of

34

a metric sufficient to exclude or include any unit along the metric's full range in a
final rule would allow an agency to "issue broad [proposed rules] only to justify
*any* final rule it might be able to devise by whimsically picking and choosing
within the four corners of a lengthy 'notice.'" *CSX Transp.*, 584 F.3d at 1082
(cleaned up). The Service simply gave no indication it would *add* an exemption for
the group of vessels 26 to 40 feet in length, which is the relevant point for the
logical outgrowth test. A "new round of notice and comment would provide the
*first* opportunity for interested parties to offer comments" on the new exemption
"that could persuade the agency to modify its rule." *Am. Water Works*, 40 F.3d at
1274 (emphasis added). The lack of notice and comment on the moderate-length
skimmer trawl vessel exemption violates the APA.

    The Service's notice-and-comment legal violation is "potentially
prejudicial" to Conservation Groups. *CSX Transp.*, 584 F.3d at 1083. Had the
Service provided a round of notice and comment on the new exemption,
Conservation Groups and other commenters "would have made additional
objections and presented significantly more (and different) evidence . . . to support
those objections" to the new exemption. *Id.* For instance, Conservation Groups
could have provided information, data, and critiques addressing the applicability of
the alleged safety and performance concerns to moderate-length skimmer trawl
vessels. *See supra* Argument sec. I.A. As just one example, Conservation Groups

could have provided data demonstrating how skimmer trawl vessels in that size class have the requisite capacity to safely use and store TEDs. Conservation Groups also could have provided critiques of the new information cited in support of the exemption; for instance, whether the mortality estimates are scientifically sound and how they relate to the need for TEDs on the full scope of the skimmer trawl fishery. *See supra* Argument sec. I.B. And Conservation Groups could have submitted information on the impacts of exempting moderate-length skimmer trawl vessels on particular sea turtle species and size classes so the Service could better evaluate the implications of the exemption for each species' recovery. *See infra* Argument sec. III (describing this gap in the Service's analysis). Conservation Groups do not need to "prove that [their] comments would have persuaded the [Service] to reach a different outcome. [The Groups'] demonstration that [they] had something useful to say . . . is sufficient to establish prejudice." *Chamber of Com. of U.S. v. Sec. & Exch. Comm'n*, 443 F.3d 890, 905 (D.C. Cir. 2006).

In sum, the Service provided no indication in the proposed rule that it was contemplating exempting moderate-length skimmer trawl vessels. The public in turn had no occasion to comment on the exemption or its basis. And that lost opportunity for comment prejudiced Conservation Groups.

**III.** **The Service Violated NEPA by Failing to Evaluate Impacts on the Individual Sea Turtle Species the Rule Is Intended to Protect.**

NEPA requires agencies to take a hard look at an action's impacts on the environmental resources the action is expected to affect. The Service promulgated the TED rule to reduce bycatch impacts and aid in the recovery of individual sea turtle species, particularly the Kemp's ridley. The Service did not analyze the impacts of the rule or its alternatives on individual sea turtle species. The final EIS simply presents mortality estimates for "sea turtles" in the aggregate without assessing how some species are disproportionately impacted. The Service accordingly failed to take a hard look at how the rule might affect sea turtle species or their recovery, in violation of NEPA.

NEPA contains "a set of 'action-forcing' procedures that require that agencies take a 'hard look' at environmental consequences" in an EIS to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989) (citation omitted). NEPA also requires full and effective disclosure of the environmental consequences to the public. *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017). "At the 'heart' of the EIS is the agency's evaluation of the potential environmental impacts of all 'reasonable alternatives' for completing the action . . . 'which would avoid or minimize adverse impacts or enhance the quality

37

of the human environment.'" *Theodore Roosevelt Conservation P'ship*, 661 F.3d at

69 (quoting *City of Alexandria v. Slater*, 198 F.3d 862, 866 (D.C. Cir. 1999); 40

C.F.R. § 1502.1 (1999)). To satisfy the hard look requirement, the EIS must

provide "a well-considered and fully informed analysis of the relevant issues." *Am.*

*Rivers v. FERC*, 895 F.3d 32, 49 (D.C. Cir. 2018) (cleaned up).

When an action affects multiple species in different ways or degrees, the

hard look standard demands the agency evaluate the impacts to each species. *See,*

*e.g.*, *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 189–96 (4th Cir. 2005);

*see also* 40 C.F.R. § 1508.27(b)(9) (2019)[6] (requiring agencies to assess the

"degree to which the action may adversely affect an endangered or threatened

species"); *Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1028–30 (9th

Cir. 2012) (holding failure to evaluate species-specific impacts to fish violated

NEPA), *vacated as moot*, 570 U.S. 901 (2013); *Washington v. U.S. Dep't of Navy*,

No. 2:19-cv-01059-RAJ-JRC, 2021 WL 8445582, at *8–9 (W.D. Wash. Dec. 10,

2021) (same for species-specific impacts to birds), *report and recommendation*

*adopted*, 2022 WL 3042001 (W.D. Wash. Aug. 2, 2022). The obligation to assess

impacts at the species level is especially important when a rule is "explicitly

---

[6] The Council on Environmental Quality revised its NEPA regulations in 2020. 85
Fed. Reg 43,304 (July 16, 2020). Those new regulations do not apply to the NEPA
analysis at issue here, which was completed in 2019. *See id.* at 43,372–73 (setting
new regulations' effective date for September 14, 2020).

designed" to affect particular species' population numbers. *Pub. Emps. for Env't Resp. v. U.S. Fish & Wildlife Serv.*, 177 F. Supp. 3d 146, 156–157 (D.D.C. 2016) (stating failure to accurately assess action's "impact on cormorants is not a trivial part of the inquiry").

The shrimp trawls involved in the rulemaking "potentially affect" all five of the sea turtle species found in southeastern U.S. waters. JA333. Each species differs in its ecology, distribution, habitat use, and abundance, so the impacts from the rule and the NEPA alternatives will vary among species. In addition, the Service's stated objective for the rulemaking is framed at the species-specific population level: "to aid in the protection and recovery of listed sea turtle populations," JA426, with a particular focus on recovering the Kemp's ridley and green sea turtle populations, JA390, JA432 (stating rule is needed to implement the Kemp's Ridley Recovery Plan). The species-specific differences and the population-focused recovery objectives required the Service to evaluate and disclose the impacts of its action on each of the five sea turtle species to make a fully informed decision and a meaningful comparison among alternatives.

Yet, the final EIS evaluates the "Direct and Indirect Effects" of the alternatives only on "sea turtles" generally, treating all five species together as a uniform category. JA362–75. It assesses only the number of sea turtles in the aggregate that would be captured and killed under each alternative, without any

attempt to estimate mortality for each species or even qualitatively evaluate how each alternative might affect any particular sea turtle species. *Id.* The table presenting the "Summary of primary effects resulting from each alternative" simply offers ranges of "sea turtles protected" in the aggregate. JA386 (tbl.128). Essentially, the analysis assumes effects to the five species will be identical; which is just as arbitrary as assuming "birds" are identically affected by an action despite obvious ecological differences among, for example, eagles, pigeons, and geese. Grouping the five sea turtle species in the effects analysis arbitrarily ignores that the species will be impacted differently based on their unique characteristics in two main ways.

*First*, the differences in habitat use affect the likelihood that turtles of a given species will be captured by shrimp trawlers fishing in certain areas. Skimmer trawls, for instance, incidentally catch and kill Kemp's ridley sea turtles in disproportionate numbers because the species forages primarily in the Gulf's nearshore waters where skimmer trawls fish. JA203, JA205. Indeed, the Service was particularly concerned about high skimmer trawl bycatch levels of juvenile Kemp's ridley turtles when it proposed the rule. JA255. Green sea turtles also forage in nearshore waters, but are more widely distributed than Kemp's ridleys. JA335. In the Gulf, green turtles are found primarily in Texas, Alabama, and Florida coastal waters, making them less vulnerable to bycatch in the Louisiana

and Mississippi nearshore shrimp fisheries. *Id.*; *see* JA329–31 (showing more skimmer trawls operate in Louisiana than other states). Loggerhead sea turtles are yet more broadly distributed and are found in both nearshore and offshore waters along the continental shelf and slope. JA351–54. So while nearshore shrimp trawling overlaps with the loggerhead's range, the species' primary habitat is not in the fishing grounds. Hawksbill and leatherback sea turtles are relatively less common in nearshore Gulf habitats: hawksbills due to their widespread distribution and nesting location outside the region, JA342, and leatherbacks due to their preference for deep offshore waters, JA350.

The Service should have recognized that these species-specific differences will result in different mortality levels for each species under the alternatives considered and especially under the exemption announced in the final rule. Disregarding habitat use differences and grouping the species made it effectively impossible for decisionmakers and the public to know how the action will affect each species. *See WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 926–27 (9th Cir. 2015) (finding EIS failed to "adequately discuss impacts on moose" where it only showed "percentage of big game winter range" protected under the action); *Nat'l Audubon Soc'y*, 422 F.3d at 187–96 (finding NEPA violation for failing to account for species-specific differences when assessing impacts to "waterfowl"); *cf. Conservation Council for Haw. v. Nat'l Marine*

41

*Fisheries Serv.*, 97 F. Supp. 3d 1210, 1223–24 (D. Haw. 2015) (explaining in

Marine Mammal Protection Act context why Service cannot group different whale

species for effects analysis where species have different characteristics). It also

prevented the Service from appreciating how the different alternatives may affect

species differently based on where the covered vessel categories fish in relation to

species' habitat preferences. *See supra* pp. 8–9 (explaining small skimmer trawl

vessels fish in very shallow waters and moderate-length skimmer trawl vessels fish

in depths where Kemp's ridleys forage); *WildEarth Guardians*, 790 F.3d at 926–27

(finding lack of moose-specific effects analysis undermined Forest Service's

consideration of alternatives that might avoid impacts to that species). Species-

specific habitat use is a highly relevant factor for taking a hard look at effects, but

the Service ignored it.

    *Second*, the degree to which each species is impacted depends on putting

estimated mortality numbers in the context of the species' population baseline. A

species with a lower population, like the Kemp's ridley, will be more susceptible to

population-level harm from deaths of individual turtles than a species with a more

robust population, like the green sea turtle. *See* JA343, JA204; *Defs. of Wildlife v.*

*U.S. Dep't of Interior*, 931 F.3d 339, 353–54 (4th Cir. 2019) (explaining in ESA

context that agency must account for a species' "already precarious state" when

assessing effects of an action on the species). The Kemp's ridley not only has the

most precarious population baseline, but it is also the most disproportionately
impacted species by the skimmer trawls in this rulemaking. JA203, JA204–05. Yet
the Service made no effort to put Kemp's ridley mortality numbers in the context
of the species' population, let alone analyze the effects of its eleventh-hour
exemption for moderate-length skimmer trawl vessels on this most vulnerable
species. Nor did it do so for any other species. The Service accordingly lacked
information to evaluate the degree to which the action would affect listed sea turtle
populations or their recovery.

The Service's failure to evaluate effects on a species-specific level is
consequential and violates NEPA in two ways. *First*, it does not provide a
complete or accurate picture—a hard look—of how the action will affect the five
sea turtle species differently based on species-specific characteristics. *See, e.g.*,
*WildEarth Guardians*, 790 F.3d at 926–27; *Nat'l Audubon Soc'y*, 422 F.3d at 187–
96. It fails to serve NEPA's disclosure function in that respect. *See Sierra Club v.
FERC*, 867 F.3d at 1367. *Second*, the final EIS fails to "present the environmental
impacts [to species] of the proposal and the alternatives in comparative form [that]
sharply defin[es] the issues and provid[es] a clear basis for choice among options
by the decisionmaker and the public." 40 C.F.R. § 1502.14 (2019). It therefore
undermines the Service's—and the public's—ability to compare the degree to
which each alternative would "aid in the protection and recovery" of individual sea

turtle populations—the stated objective of the rulemaking. JA426; *see Nat. Res. Def. Council, Inc. v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988) (finding EIS did "not constitute analysis useful to a decisionmaker in deciding whether, or how, to alter the program to lessen cumulative environmental impacts").

The District Court erred by finding the Service's background description of differences among the sea turtle species is sufficient to constitute a hard look at species-specific impacts. JA145–46; *see also* JA127. But that background discussion in the EIS's "Affected Environment" section does not constitute an assessment of the rule's *effects* on species that NEPA requires. Rather, that section simply presents the characteristics of each sea turtle species "*to be* affected" by the action. 40 C.F.R. § 1502.15 (2019) (emphasis added). It is no substitute for a discussion of the action's "effects and their significance" for sea turtles. *Id.* § 1502.16 (2019) (describing separately required "environmental consequences" analysis); *see id.* § 1502.15 (2019) ("Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement."). Nor does the background section provide the sort of "scientific and analytic basis" for a comparison among alternatives that is otherwise required in a discussion of the environmental consequences. *Id.* § 1502.15 (2019). That sort of species-specific analysis of the effects of each alternative is nowhere to be found.

The shrimp trawls in this rulemaking undeniably affect each of the five sea turtle species differently, but the Service ignored those differences when assessing effects. Particularly where the whole point of this rule is to protect the most vulnerable of those species, a species-specific effects assessment is "an integral component" of the Service's selection of an alternative that will sufficiently aid in recovering listed sea turtle species. *Sierra Club v. FERC*, 827 F.3d 36, 45 (D.C. Cir. 2016). Without such analysis, the Service did not and could not make a "fully informed and well-considered" decision. *Hodel*, 865 F.2d at 294 (cleaned up).

## IV.    The Court Should Remand the TED Rule and EIS without Vacatur and Impose a Remand Deadline.

Conservation Groups respectfully ask this Court to remand the final rule and final EIS without vacatur and impose a deadline to complete the remand within one year. "As a general rule," courts do "not vacate regulations when doing so would risk significant harm to the public health or the environment." *Wisconsin v. EPA*, 938 F.3d 303, 336 (D.C. Cir. 2019) (citing *Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Such is the case here: the TED rule provides some additional protection to sea turtles by requiring TEDs on a portion of the southeastern U.S. shrimp fleet that would be lost with vacatur during remand.

However, sea turtles will continue to be placed at significant risk of harm by the inadequacy of the TED regulations during remand. The Service has a lengthy

45

track record of delay in addressing sea turtle bycatch in nearshore shrimp trawls.
*See supra* pp. 12–13. Accordingly, it is imperative to impose a deadline for the
Service to take further action on the remand. The Court has the inherent
"discretionary authority to impose a deadline for the remand proceedings" under
the APA. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 937
(9th Cir. 2008); *see Nat. Res. Def. Council, Inc. v. Train*, 510 F.2d 692, 705 (D.C.
Cir. 1974).

A one-year remand deadline would be appropriate and feasible. That
timeline is based primarily on the fact that the Service has already been working on
a new TED rulemaking for the past two years. On April 20, 2021, the Service
published for public comment an advance notice of proposed rulemaking that
would remove the moderate-length skimmer trawl vessel exemption and require
those vessels to use TEDs, but it has not yet published a proposed rule. 86 Fed.
Reg. 20,475 (Apr. 20, 2021). There is significant overlap between the pending
work to develop that proposed rule and fixing the errors in the rule challenged
here, such as engaging in additional analysis of TED requirements and considering
information received in public comments on the advance notice. To be clear,
Conservation Groups are not requesting a deadline for final action on the 2021
advance notice of proposed rulemaking, although such separate final action would
be one way the Service could meet a remand deadline. The Service could

alternatively make a new decision on the 2016 proposed rule following compliance with the APA and NEPA. Regardless of the vehicle it chooses to accomplish this, the Service is more than capable of remedying the errors identified in this case within one year of this Court's ruling.

## CONCLUSION

For the foregoing reasons, the Court should declare that the final TED rule and final EIS violate the APA and NEPA and remand the rule and EIS to the Service to take further action within one year.

Respectfully submitted this 15th day of August, 2023.

<div style="margin-left:40%">

*/s/ Christopher D. Eaton*
Christopher D. Eaton (CADC Bar No. 60490)
Stephen D. Mashuda (CADC Bar No. 60505)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
415-217-2040 Fax
ceaton@earthjustice.org
smashuda@earthjustice.org

*Attorneys for Plaintiffs-Appellants Center for Biological Diversity, Defenders of Wildlife, and Turtle Island Restoration Network*

</div>

## CERTIFICATE OF COMPLIANCE

In accordance with Circuit Rule 28(a)(1) and Fed. R. App. P. 32(a)(7), the undersigned certifies that the accompanying brief has been prepared using 14-point Times New Roman typeface, and is double-spaced (except for headings and footnotes).

The undersigned further certifies that the brief is proportionally spaced and contains 11,052 words, excluding the parts of the brief exempted by Circuit Rule 32(e)(1) and Fed. R. App. P. 32(f).

The undersigned used Microsoft Word 2016 to compute the word count.

Respectfully submitted this 15th day of August, 2023.

*/s/ Christopher D. Eaton*
Christopher D. Eaton (CADC Bar No. 60490)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
ceaton@earthjustice.org

*Attorney for Plaintiffs-Appellants Center for Biological Diversity, Defenders of Wildlife, and Turtle Island Restoration Network*