## ORAL ARGUMENT NOT YET SCHEDULED

No. 22-5295

---

### UNITED STATES COURT OF APPEALS
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CENTER FOR BIOLOGICAL DIVERSITY, DEFENDERS OF WILDLIFE,
and TURTLE ISLAND RESTORATION NETWORK,

*Plaintiffs-Appellants*,

v.

NATIONAL MARINE FISHERIES SERVICE and GINA RAIMONDO, in her
official capacity as Secretary of Commerce,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
NO. 1:21-CV-00930-BAH
HONORABLE BERYL A. HOWELL, U.S. DISTRICT COURT JUDGE

---

## FINAL REPLY BRIEF OF APPELLANTS

---

Christopher D. Eaton (CADC Bar No. 60490)
Stephen D. Mashuda (CADC Bar No. 60505)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
415-217-2040 Fax
ceaton@earthjustice.org
smashuda@earthjustice.org

*Attorneys for Plaintiffs-Appellants Center for
Biological Diversity, Defenders of Wildlife,
and Turtle Island Restoration Network*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................3

GLOSSARY.................................................................................................6

INTRODUCTION .......................................................................................1

SUMMARY OF ARGUMENT .....................................................................2

ARGUMENT ..............................................................................................2

I.    The Service Expressly Based the Final Rule on Grounds that Are
      Arbitrary and Counter to the Record. ............................................2

      A.    The Record Does Not Support the Service's Invocation of
            Safety and Performance Issues to Exempt Skimmer Trawl
            Vessels 26 to 40 Feet in Length. ...........................................4

      B.    The Service's Asserted Economic Rationale Cannot Justify the
            Exemption for Vessels 26 to 40 Feet in Length that Expressly
            Rests at Least in Part on Other Invalid Grounds...................8

      C.    The Cited New Information About Sea Turtle Bycatch in the
            Otter Trawl Fleet Does Not Support the Service's Decision to
            Exempt Skimmer Trawl Vessels 26 to 40 Feet in Length from
            TED Requirements. ............................................................11

II.   The Final Rule's New Exemption for Skimmer Trawl Vessels 26 to
      40 Feet in Length Is Not a Logical Outgrowth of the Proposed Rule...........13

III.  The Service Violated NEPA by Failing to Evaluate Impacts on the
      Individual Sea Turtle Species the Rule Is Intended to Protect. .....................19

      A.    The Final EIS Fails to Evaluate the Effects to Individual Sea
            Turtle Species. ...................................................................19

      B.    The Service's NEPA Violation Is Properly Before this Court. ..........23

CONCLUSION .........................................................................................26

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page(s)**

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*,
    24 F.4th 666 (D.C. Cir. 2022)...................................................................9

*Ariz. Pub. Serv. Co. v. EPA*,
    211 F.3d 1280 (D.C. Cir. 2000).............................................................17

*Ass'n of Am. Railroads v. U.S. Dep't of Transp.*,
    38 F.3d 582 (D.C. Cir. 1994)................................................................14

*Chamber of Com. of U.S. v. SEC*,
    443 F.3d 890 (D.C. Cir. 2006)................................................17, 18, 19

*City of New York v. Nat'l R.R. Passenger Corp.*,
    776 F.3d 11 (D.C. Cir. 2015)................................................................23

*City of Waukesha v. EPA*,
    320 F.3d 228 (D.C. Cir. 2003)..............................................................18

*CSX Transp., Inc. v. Surface Transp. Bd.*,
    584 F.3d 1076 (D.C. Cir. 2009).........................................14, 15, 16, 19

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004).............................................................................25

*Env't Integrity Project v. EPA*,
    425 F.3d 992 (D.C. Cir. 2005).......................................................14, 15

*Feld v. Fireman's Fund Ins. Co.*,
    909 F.3d 1186 (D.C. Cir. 2018)............................................................23

*Fertilizer Inst. v. EPA*,
    935 F.2d 1303 (D.C. Cir. 1991).....................................................15, 17

*Humane Soc'y of U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) .............................................................12

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
    305 F.3d 957 (9th Cir. 2002) ...............................................................20

*Authorities upon which we chiefly rely are marked with asterisks.*

*Int'l Union, United Mine Workers of Am. v. Dep't of Labor*,
　358 F.3d 40 (D.C. Cir. 2004) ...............................................................10

*Lands Council v. McNair*,
　629 F.3d 1070 (9th Cir. 2010) .......................................................24, 25

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
　463 U.S. 29 (1983) ...........................................................3, 5, 7, 8, 13

*Nat. Fuel Gas Supply Corp. v. FERC*,
　468 F.3d 831 (D.C. Cir. 2006) .......................................................8, 11

*Nat'l Audubon Soc'y v. Dep't of Navy*,
　422 F.3d 174 (4th Cir. 2005) ...............................................................20

*Native Ecosystems Council v. Dombeck*,
　304 F.3d 886 (9th Cir. 2002) ...............................................................24

*Ne. Md. Waste Disposal Auth. v. EPA*,
　358 F.3d 936 (D.C. Cir. 2004).............................................................25

*Pac. Rivers Council v. U.S. Forest Serv.*,
　689 F.3d 1012 (9th Cir. 2012) .............................................................20

*SEC v. Chenery*,
　332 U.S. 194 (1947)...............................................................................9

*Shell Oil Co. v. EPA*,
　950 F.2d 741 (D.C. Cir. 1991)..............................................................17

*Sierra Club v. FERC*,
　867 F.3d 1357 (D.C. Cir. 2017)............................................................22

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
　289 F.3d 89 (D.C. Cir. 2002)...............................................................18

*\*U.S. Sugar Corp. v. EPA*,
　830 F.3d 579 (D.C. Cir. 2016).........................................................6, 7

*Util. Solid Waste Activities Grp. v. EPA*,
　901 F.3d 414 (D.C. Cir. 2018)..........................................................3, 8

*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
   6 F.4th 1321 (D.C. Cir. 2021)................................................................8

*\*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC,*
   475 F.3d 319 (D.C. Cir. 2006)......................................8, 9, 10, 11, 13

**Other Authorities**

40 C.F.R. § 1502.15 ................................................................................21

40 C.F.R. § 1502.16. ...............................................................................21

40 C.F.R. § 1508,27 ................................................................................20

86 Fed. Reg. 20,475 (Apr. 20, 2021) .....................................................26

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy Act |
| TED | Turtle Excluder Device |
| The Service | National Marine Fisheries Service |

**INTRODUCTION**

The National Marine Fisheries Service (the Service) has long recognized the need to protect imperiled sea turtles—especially the Kemp's ridley—from high levels of mortality in skimmer trawls fishing for shrimp in the southeastern United States. Yet in 2019, the Service finalized a rule that exempts the vast majority of skimmer trawl vessels from using a turtle excluder device (TED), which prevents incidentally caught turtles from drowning in nets. In doing so, the Service—for the first time—manufactured a broad exemption for vessels between 26 and 40 feet in length based on alleged safety and performance issues and new information that lack any rational connection to the record, and without any opportunity for the public to comment on this novel exemption, in violation of the Administrative Procedure Act (APA). In addition, the Service failed to assess the rule's impacts on individual sea turtle species, in violation of the National Environmental Policy Act (NEPA).

In its response, the Service continues to rely on conclusory statements and *post hoc* arguments by counsel, and overall fails to demonstrate that its rationale is supported by the record or complies with public comment and NEPA requirements. The Service's inability to direct the Court to evidence supporting its stated rationale or the required public notice only underscores how the final rule is arbitrary and capricious and must be remanded for new action within one year.

1

## SUMMARY OF ARGUMENT

1.     The Service offers no record support to substantiate two arbitrary grounds—safety and performance issues and new information on sea turtle mortality—it relied on to exempt skimmer trawl vessels up to 40 feet in the final rule. The Service's asserted reliance on a third, supplemental ground (economic concerns) cannot save the rule.

2.     The Service fails to point to anything in the proposed rule providing notice the Service was contemplating a broader exemption. The Service's assertion that the logical outgrowth test is met whenever a final rule regulates some subset of entities covered under the proposal is not the legal standard.

3.     The Service has not shown that it was under no obligation to assess effects to individual sea turtle species in its EIS nor has it shown that it did assess such effects. The Service's contention that Conservation Groups forfeited their NEPA argument has been waived and lacks merit because the Groups and others raised this issue in comments on the proposal.

## ARGUMENT

## I.    <u>The Service Expressly Based the Final Rule on Grounds that Are Arbitrary and Counter to the Record.</u>

The Service rested its decision to exempt skimmer trawl vessels 26 to 40 feet in length from TED requirements at least in part on two grounds that are belied by the record: (1) alleged performance and safety issues with TED use on those

vessels, and (2) new information on sea turtle mortality in the offshore shrimp fleet. JA427. The Service's use of these unsupported justifications renders the final rule arbitrary and capricious—it lacks a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (citation omitted); *see Util. Solid Waste Activities Grp. v. EPA*, 901 F.3d 414, 434 (D.C. Cir. 2018) (stating rule is "unreasoned, arbitrary, and capricious" when "administrative record belies the [agency's] stated reason" for its decision). *See generally* Opening Br. of Appellants (Op. Br.) 20–31.

In its response, the Service claims that its decision (1) was justified based on public comments regarding performance and safety issues with smaller vessels and economic impacts, and (2) properly accounted for new information regarding lower levels of mortality in the offshore fleet. Br. for Appellees (Service Br.) 19, 26–28 (citing JA427).[1] However, neither argument cures the Service's express reliance in the final rule on unsupported and arbitrary grounds to exempt the majority of skimmer trawl vessels from TED requirements.

---

[1] While the Service accuses Conservation Groups of improperly creating a moderate-length "category" that does not exist, *see* Service Br. 24, 36, Conservation Groups simply used "moderate-length" as a shorthand to refer to vessels 26 to 40 feet, as opposed to "small" vessels under 26 feet, *see* Op. Br. 15 n.2.

A.    <u>The Record Does Not Support the Service's Invocation of Safety and
Performance Issues to Exempt Skimmer Trawl Vessels 26 to 40 Feet
in Length.</u>

The record belies the Service's reliance on safety and performance issues to

justify exempting skimmer trawl vessels 26 to 40 feet from the final rule. Op. Br.

22–27. Confronted with this problem, the Service is able to cite just two comments

from the Audubon Nature Institute, summarizing interviews with fishermen

regarding the proposed rule, to claim that safety and performance concerns "were

not solely from owners or operators of vessels under 26 feet." Service Br. 28–29

(citing JA288, JA290–91). Neither comment supports the Service's rationale in the

final rule that performance or safety issues exist for skimmer trawls 26 to 40 feet to

warrant their exemption, especially considering the Service's findings that safety

and performance issues exist for vessels *up to* 26 feet.

While some of the interviewees apparently expressed general concern about

the safety of TED use, nothing in the cited comments identifies concrete issues

with TED use on vessels over 26 feet. JA288, JA291. Conversely, the final rule

and its supporting documents describe the identified safety and performance issues

with TED use, all of which it states are limited to vessels under 26 feet. JA440; *see*

Op. Br. 22–25. Nothing in the responses to comments in the final environmental

impact statement (EIS), the final rule, or anywhere else in the record shows that the

Service believed that the Audubon Nature Institute's comments identified safety or

performance issues for skimmer trawl vessels larger than 26 feet sufficient to warrant creating a new alternative exempting those vessels.[2] Rather, the signed record of decision for the final rule explains that "given the information received during the comment periods," the Service had concerns about the practicability and safety of TED use only on vessels *less than* 26 feet that would warrant additional testing before requiring TEDs on that size class—that is, the Service believed safety and performance concerns justified only a limited exemption for vessels under 26 feet. JA421–22.[3] The Court should reject counsel's attempt to retroactively ground the Service's sweeping exemption for nearly 80% of the vessels proposed for TED requirements in selected, general statements in two comment letters, which lack any apparent connection to the Service's findings in the final rule. *See State Farm*, 463 U.S. at 50 (stating that "courts may not accept appellate counsel's *post hoc* rationalizations for agency action" which "must be upheld, if at all, on the basis articulated by the agency itself").

---

[2] The Service relies on an alleged suggestion from an individual at a public hearing to exempt vessels up to 40 feet as a basis for its decision, Service Br. 14–15 (citing JA436); *see also* JA098 (asserting the comment supported the "agency's decision to establish the 40-foot criterion" for the exemption), but no reasons or record evidence are provided for that suggestion, *see* Op. Br. 24–25 n.4.

[3] While the Service now claims the record of decision was "inadvertently signed" by a Deputy Assistant Administrator, it never disputes the document's findings. Service Br. 30 n.6. Moreover, the Service's litigation affidavit and alleged *post hoc* "corrected" record of decision are not properly before the Court and should be disregarded. *See* Op. Br. 25 n.5.

The Service's attempt to distinguish this Circuit's decision in *United States Sugar Corp. v. EPA* misses the mark. *See* Service Br. 31–33 (citing 830 F.3d 579 (D.C. Cir. 2016)). First, the Service contends that the case at bar "bears no resemblance" to that decision because the Service did not recognize or establish distinct skimmer trawl size "categories." *Id.* at 31–32. However, the Service cannot distinguish the case based on semantics. Regardless of whether the Service considers different-sized vessels to be parts of a "spectrum" or "categories" of lengths, *id.*, the holding of *U.S. Sugar Corp.* is controlling: when an agency identifies operational concerns applicable to one identified subset of regulated entities (skimmer trawl vessels under 26 feet here; natural area source boilers in *U.S. Sugar Corp.*), it cannot rely on those concerns to exempt another subset (skimmer trawl vessels 26 to 40 feet here; synthetic area boilers in *U.S. Sugar Corp.*) without any evidence that such concerns apply to the latter, *U.S. Sugar Corp.*, 830 F.3d at 650–51.

Second, the Service claims its rationale for the broader skimmer trawl exemption in the final rule could not possibly contradict any determinations in the proposed rule because those determinations were only "preliminary." Service Br. 33. That is irrelevant because the salient problem is that the rationale contradicts the findings and the record for the *final rule*—as well as findings in the proposed rule. Op. Br. 22–26. In addition, the cited "preliminary" findings in the proposed

rule pertained only to the Service's determination that the proposed measures complied with the Endangered Species Act (ESA), not to any safety and performance findings, which were not labeled preliminary. *See* JA256 ("[W]e preliminarily determined that the measures proposed here are necessary and advisable to conserve threatened and endangered sea turtle species . . . [and] are necessary and appropriate to enforce the requirements of the ESA."). Even if this case turned solely on inconsistencies with "preliminary" findings in the proposed rule, *U.S. Sugar Corp.* involved preliminary findings in a proposed rule that the Circuit held were contradicted in the final rule's rationale. *See* 830 F.3d at 650. While it is certainly true that agencies are free to modify a proposed rule based on comments they receive, this does not excuse the Service from demonstrating a rational connection between its stated basis for its ultimate decision and the record. *See State Farm*, 463 U.S. at 43; *cf. U.S. Sugar Corp.*, 830 F.3d at 641 (upholding a different EPA modification from the proposed rule supported by record evidence from comments).

In sum, the Service cannot rely on its bare assertion that safety and performance issues justify exempting skimmer trawl vessels 26 to 40 feet because it lacks a "rational connection between the facts found and the choice made," in violation of the APA. *State Farm*, 463 U.S. at 43 (citation omitted); *see Util. Solid Waste*, 901 F.3d at 432–34 (finding EPA's stated rationale unsupported by record).

7

B.    The Service's Asserted Economic Rationale Cannot Justify the Exemption for Vessels 26 to 40 Feet in Length that Expressly Rests at Least in Part on Other Invalid Grounds.

The Service next contends that the change from the proposed rule to exempt skimmer trawl vessels 26 to 40 feet in the final rule complies with the APA because it was based not solely on safety and performance concerns, but also on economic impacts. Service Br. 29. Regardless of whether the asserted economic rationale is valid, the final rule must be held arbitrary and capricious because it admittedly rests "at least in part" on the "infirm" safety and performance ground, as well as the new information ground discussed below. *Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319, 330 (D.C. Cir. 2006).

"'When an agency relies on multiple grounds for its decision, some of which are invalid,' [a court] may only 'sustain the decision where one is valid and the agency would clearly have acted on that ground even if the other were unavailable.'" *Id.* (citation omitted); *accord Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1331 (D.C. Cir. 2021); *see also Nat. Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 839 (D.C. Cir. 2006) ("[W]here [the agency] has relied on multiple rationales (and has not done so in the alternative), and we conclude that at least one of the rationales is deficient, we will ordinarily vacate the order unless we are certain that [the agency] would have adopted it even absent the flawed rationale."). To sustain an action on the valid

8

ground, the record itself must *clearly*—not just potentially—demonstrate that the

agency deemed that ground independently sufficient for its action. *See Am. Fed'n*

*of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 24 F.4th 666, 677 (D.C. Cir.

2022) (explaining agency did not present allegedly valid rationale "as an

alternative basis that could bear the full weight of its zipper-clause decision absent

its [invalid] holding, so we cannot now view it that way"); *Williams Gas*, 475 F.3d

at 330 (finding agency's "orders do not reveal whether" agency would have made

same decision on the basis of its valid finding "alone"). "Arbitrary and capricious

review strictly prohibits [a court] from upholding agency action based only on [the

court's] best guess as to what reasoning truly motivated it." *Williams Gas*, 475

F.3d at 328–29; *SEC v. Chenery*, 332 U.S. 194, 196–97 (1947) ("It will not do for

a court to be compelled to guess at the theory underlying the agency's action; nor

can a court be expected to chisel that which must be precise from what the agency

has left vague and indecisive.").

In the final rule, the agency explicitly invoked three justifications for its

decision to exempt skimmer trawls 26 to 40 feet in length, two of which—the

safety and performance issues discussed above and the new information about sea

turtle mortality in the offshore fleet discussed below—lack a rational connection to

the record. JA427; *see also* JA433, JA434. Nowhere does the final rule indicate the

Service would have adopted the same broad exemption based solely on economics,

without any reliance on the other two grounds. That is enough to doom the rule. *See Int'l Union, United Mine Workers of Am. v. Dep't of Labor*, 358 F.3d 40, 44–45 (D.C. Cir. 2004) (finding agency's decision arbitrary where "[t]wo of the three reasons it gave . . . would not support its decision, and we do not know—nor are we free to guess—what the agency would have done had it realized that it could not justify its decision" on the invalid grounds). On the contrary, the Service states in its brief that "both" the economic issues and safety and performance issues were integral to its decision to create the broad skimmer trawl exemption. Service Br. 29–30. Because it is undisputed that the Service "rested its [decision], at least in part, on its infirm" safety and performance ground, the Court "must find the [final TED rule] devoid of reasoned decisionmaking and set [it] aside as arbitrary and capricious." *Williams Gas*, 475 F.3d at 330.

Even if the Service were to now claim that economic concerns alone were sufficient to justify the broader exemption regardless of safety and performance issues and the new information, that could not sustain the rule.[4] For one, such an

---

[4] To be clear, there are problems with the Service's economic justifications for exempting vessels up to 40 feet. For example, the Service's claim that the broader exemption would "focus conservation requirements on larger, full-time vessels," Service Br. 38, is undermined by the record. The more limited exemption for skimmer trawl vessels under 26 feet in length would have required TEDs on nearly 90% of full-time skimmer trawls while exempting the majority of part-time vessels. *See* JA386 (compare Alternative 4 (requiring TEDs on skimmer trawls 26 feet and longer) with Alternative 5 (requiring TEDs on all skimmer trawls)). But the added exemption for vessels 26 to 40 feet in the final rule exempts nearly half

assertion would be contrary to the agency's own express reliance in the rule on the two infirm grounds. Moreover, statements by litigation counsel cannot retroactively provide the necessary explanations for how an agency weighed multiple rationales for its action. *Williams Gas*, 475 F.3d at 330; *Nat. Fuel Gas*, 468 F.3d at 839.

C.    The Cited New Information About Sea Turtle Bycatch in the Otter Trawl Fleet Does Not Support the Service's Decision to Exempt Skimmer Trawl Vessels 26 to 40 Feet in Length from TED Requirements.

The other rationale offered in the final rule for exempting skimmer trawl vessels up to 40 feet—new information regarding sea turtle bycatch by otter trawl vessels—also lacks a rational connection to the exemption. *See* Op. Br. 27–29. As the Service admits, this study "means that skimmer trawls are responsible for a greater share of the bycatch, which 'further supports the need for sea turtle conservation in the skimmer trawl fisheries.'" Service Br. 34 (quoting JA432). The Service now claims that it did not use the study to justify its reduction in the scope of skimmer trawl vessels covered from the proposed rule as the final rule states, but rather "to expand the required use of TEDs to skimmer trawl vessels 40 feet or

---

of the full-time vessels that would have been covered under the limited exemption, the opposite of focusing additional conservation requirements on full-time vessels. *Id.* (compare Alternative 8 (final rule) with Alternative 4).

longer." *Id.* at 35. This *post hoc* assertion is a gross mischaracterization of the record and must be rejected.

The final TED rule expressly states the Service "revised the regulation to *limit* the TED requirements to skimmer trawl vessels 40 feet and greater in length" "[b]ased on" the new information. JA427 (emphasis added) (section titled "Changes From the Proposed Rule"). In the proposed rule, the Service would have required the use of TEDs on *all* skimmer trawl vessels, regardless of size. JA254. The final rule changed that requirement to exempt most skimmer trawls. The Service's *post hoc* attempt to claim it used the information to increase TED requirements from the status quo, rather than to reduce the requirements from those in the proposed rule, flatly contradicts its express rationale in the final rule and provides no basis for upholding its decision. *See Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1050 (9th Cir. 2010) ("Defendants' post hoc explanations serve only to underscore the absence of an adequate explanation in the administrative record itself.").

Given that the study emphasizes the disproportionately higher need for turtle protection in the skimmer trawl fleet, it was arbitrary for the Service to *reduce* sea turtle conservation by exempting skimmer trawl vessels up to 40 feet in the final rule, thereby significantly reducing the overall number of skimmer trawls required to use TEDs. *See State Farm*, 463 U.S. at 43. In its response, the Service simply

12

cannot explain why the study supports that decision. The Court should not

countenance its *post hoc* contention that it instead relied upon the study for a

different purpose. *Williams Gas*, 475 F.3d at 330.

## II.    The Final Rule's New Exemption for Skimmer Trawl Vessels 26 to 40 Feet in Length Is Not a Logical Outgrowth of the Proposed Rule.

As the Service acknowledges, the logical outgrowth test is met if interested

parties "should have anticipated that the change was possible, and thus reasonably

should have filed their comments on the subject" during the comment period.

Service Br. 36 (quoting *Chesapeake Climate Action Network v. EPA*, 952 F.3d

310, 319 (D.C. Cir. 2020)). Conservation Groups have explained that the proposed

rule gave no indication that the Service was considering exempting skimmer trawl

vessels 26 to 40 feet from TED requirements, in contrast to its notice that the

Service was contemplating exempting only certain other specified vessel types and

sizes. Op. Br. 13–15, 32–33. Consequently, Conservation Groups and other

commenters could not possibly "have anticipated" the Service's novel exemption

for an additional size class of vessels. The new exemption is not insignificant: it

exempts over 80% of vessels that would have been covered by the proposed rule—

or nearly two-thirds of vessels that would have been covered under the broadest

exemption contemplated in the proposed rule—and results in over a thousand more sea turtle deaths every year than under the proposed rule. JA314 (tbl.I).[5]

The Service's arguments fail to demonstrate the final rule meets the logical outgrowth test. First, the Service claims that the final rule is "within the scope of the proposed rule" because it fell between the extremes of doing nothing and requiring TEDs on all skimmer trawls. Service Br. 37. However, this is not the applicable legal standard. The critical question is whether the agency has provided commenters notice "about *which particular* aspects of its proposal are open for consideration." *Env't Integrity Project v. EPA*, 425 F.3d 992, 998 (D.C. Cir. 2005); *accord CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1082 (D.C. Cir. 2009).[6] An all-to-nothing scope offers no indication about the particular aspects within that scope that the agency is considering for omission from the final rule. Indeed, this Circuit has rejected the Service's premise that an agency can rely on a proposed rule's broad scope "only to justify any final rule it might be able to

---

[5] Alternative 8 is the final rule. Alternative 3 is the proposed rule. Alternative 4 is the broadest contemplated exemption, for skimmer trawl vessels under 26 feet and all pusher-head and wing net trawls.

[6] *Association of American Railroads v. U.S. Department of Transportation*, cited by the Service, is inapposite for this reason: the court found the final rule was a logical outgrowth because the proposed rule "contemplated, gave notice of, and invited comments on" the particular aspect that was modified in the final rule, *not* simply because the final rule fell within the scope of the proposed rule as the Service implies. 38 F.3d 582, 589 (D.C. Cir. 1994).

14

devise by whimsically picking and choosing within the four corners of a lengthy 'notice.'" *Env't Integrity Project*, 425 F.3d at 998; *accord CSX Transp.*, 584 F.3d at 1082. *Fertilizer Institute v. EPA* involved a similar situation to here, where under the status quo, no facilities were required to report the release of radionucleotides to the EPA. 935 F.2d 1303, 1306 (D.C. Cir. 1991). After proposing a rule that would have required such reporting from all sources, the EPA exempted certain facilities from the requirement in the final rule. *Id.* at 1306–07. This Circuit held that the final rule failed the logical outgrowth test because the proposed rule "makes no mention of the possible creation of" the exemptions in the final rule. *Id.* at 1311. As here, the new exemptions walked back the proposed change to the status quo from the proposed rule, so the final rule was "within the scope" of the proposed rule (in the Service's formulation). But it was not a logical outgrowth of that proposed rule because commenters were not given an adequate opportunity to comment on the new exemptions. *Id.* at 1312.

Second, the Service claims that interested parties were "on notice" that it was considering alternatives that "would require TED use by various types and/or size shrimp trawlers." Service Br. 37 (quoting JA246). But the Service was explicit—both in the quoted passage from the draft EIS and in the proposed rule—that it was referring only to skimmer trawls sized *under* 26 feet for exemption. As Conservation Groups explained, the fact that the contemplated small vessel

exemption used length as a metric gave no notice that the Service would additionally exempt vessels larger than 26 feet. *See* Op. Br. 34–35 (analogizing *inter alia CSX Transp.*, 584 F.3d at 1082).[7] The Service's contention that there is no meaningful difference between the exemption for vessels under 26 feet and the exemption for vessels up to 40 feet is absurd. Service Br. 37–38. The broader exemption implicates different size-dependent safety and performance considerations, bycatch mitigation requirements for nearly 2,000 additional vessels, and several hundred additional sea turtle deaths each year, all important issues on which the public could not comment because the Service gave no notice it was contemplating a broader exemption.

Third, the Service asserts that the proposed rule put interested parties on notice that it was "considering *phasing in* any new TED requirements 'based on vessel size.'" *Id.* at 38 (emphasis added) (quoting JA256). But a suggestion that new TED requirements contained in a final rule might be phased in over time for different-sized vessels is entirely different from exempting certain vessel sizes

---

[7] The Service attempts to distinguish *CSX Transportation* by comparing the difference between the final and proposed rule in that case to the difference between the final rule and the status quo—*not* the proposed rule—in this case. Service Br. 39–40. Such an apples to oranges comparison cannot and does not make the case inapposite. The critical issue both here and there is that each final rule adopted a scope of coverage that was meaningfully different from the potential scope indicated in the proposed rule.

from the requirements altogether. An exemption is "surprisingly distant" from a proposal to slightly delay the effective date for TED requirements on those vessels. *Ariz. Pub. Serv. Co. v. EPA*, 211 F.3d 1280, 1299 (D.C. Cir. 2000). The final rule does not include a phase-in requirement based on size, only an exemption.

Fourth, the Service claims the changes in the final rule were a logical outgrowth because they "were a direct response to comments." Service Br. 39. But this Circuit has repeatedly made clear that an agency "cannot bootstrap notice from a comment"—the agency "must *itself* provide notice of a regulatory proposal." *Fertilizer Inst.*, 935 F.2d at 1312 (quoting *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983)); *see Shell Oil Co. v. EPA*, 950 F.2d 741, 760 (D.C. Cir. 1991) (rejecting premise that final rule could be "a 'logical outgrowth' of the *comments* received"). Because nothing in the proposed rule suggested that the Service was contemplating a broader exemption to include skimmer trawl vessels 26 to 40 feet, the final rule is not a logical outgrowth.

Finally, the Service claims that Conservation Groups "were not prejudiced" by the inadequate notice because their potential comments would not amount to "new and different criticisms which the agency might find convincing." Service Br. 40–43 (quoting *United Mine Workers*, 626 F.3d at 95). But Conservation Groups do not need to "prove that [their] comments would have persuaded the [Service] to reach a different outcome." *Chamber of Com. of U.S. v. SEC*, 443 F.3d

17

890, 905 (D.C. Cir. 2006). To establish prejudice, a party need only show that,

"had proper notice been provided, they would have submitted additional, different

comments that could have invalidated the rationale for the revised rule." *City of*

*Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003); *see also Chamber of Com.*,

443 F.3d at 905 (stating party must only demonstrate "it had something useful to

say" about the basis for the change); *cf. Sugar Cane Growers Co-op. of Fla. v.*

*Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) ("[A]n utter failure to comply with

notice and comment cannot be considered harmless if there is any uncertainty at all

as to the effect of that failure.").

 That is exactly the situation here. If Conservation Groups had known that the

Service was going to additionally exempt skimmer trawl vessels 26 to 40 feet in

length from TED requirements, they would have provided additional information

and data in their comments to address whether the additional exemption—and the

Service's purported rationale for it—was warranted. Conservation Groups

provided examples of such information in their opening brief, such as rebuttals to

supposed concerns with storing TEDs on skimmer trawl vessels over 26 feet and

information and analysis of the previously undisclosed sea turtle mortality

estimates under the new alternative. Op. Br. 35–36. It is not necessary, as the

Service implies, for Conservation Groups to demonstrate that they would have

addressed each and every aspect of the final rule changes and their bases to show

prejudice. *See, e.g.*, *CSX Transp.*, 584 F.3d at 1083 (citing just one "example" of evidence petitioners could have submitted as sufficient to show prejudice). Conservation Groups have demonstrated they "had something useful to say" about the new exemption for 26- to 40-foot skimmer trawls and that "is sufficient to establish prejudice." *Chamber of Com.*, 443 F.3d at 905.

**III.   The Service Violated NEPA by Failing to Evaluate Impacts on the Individual Sea Turtle Species the Rule Is Intended to Protect.**

   A.   The Final EIS Fails to Evaluate the Effects to Individual Sea Turtle Species.

Conservation Groups have explained how the final EIS violates NEPA by failing to evaluate the effects of the final rule or alternatives on individual sea turtle species or their recovery, particularly the Kemp's ridley. Op. Br. 37–45. In response, the Service neither establishes that it did not need to assess species-specific impacts nor attempts to demonstrate that it did assess the impacts, instead attempting to divert the Court's attention to other portions of the EIS. *See* Service Br. 46–51. The Service's arguments are unavailing.

First, the Service claims that it did not need to assess species-specific impacts "[b]ecause the rulemaking was not designed to achieve a specific conservation target for any one species." *Id.* at 47. But NEPA does not limit the obligation to analyze effects to only those effects for which the agency has set a specific target: a "hard look" includes "considering *all* foreseeable direct and

indirect impacts," as well as cumulative impacts. *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 973 (9th Cir. 2002) (emphasis added). When the action will affect species differently, NEPA's hard look requirement demands a species-specific effects analysis, even if there is no specific conservation target for any one species. *See Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 191−95 (4th Cir. 2005) (holding failure to conduct species-specific assessments violated NEPA without referring to any conservation targets); *Pac. Rivers Council v. U.S. Forest Serv.*, 689 F.3d 1012, 1028–30 (9th Cir. 2012) (same), *vacated as moot*, 570 U.S. 901 (2013).[8] In any event, the Service explained several times that its focus in the rulemaking was to help recover the Kemp's ridley—i.e., a conservation target for a particular species. *See, e.g.*, JA240–41, JA390, JA255, JA432. The Service could not rationally assess the degree to which the final rule accomplished this objective without any assessment of the effects to that species.

The Service next claims that it did include species-specific information in various places in the EIS. Service Br. 47–49. But the cited information is not an assessment of the *effects* to individual species. As Conservation Groups have

---

[8] The Service's claim that 40 C.F.R. § 1508.27(b)(9) (2019)—which requires an agency to consider the "degree to which the action may adversely affect an endangered or threatened species"—is "inapplicable" because the final TED rule does not adversely affect a listed species misses the point. Service Br. 49–50. This regulation demonstrates that assessing effects on threatened and endangered species is of particular importance under NEPA.

explained, an assessment of effects to a species requires (1) determining the
species' baseline population or status, (2) estimating the degree of mortality and
serious harm that would result to individuals in the population from the action and
its alternatives, and then (3) importantly, analyzing how the estimated mortality
and harm will alter or otherwise impact the species' population. Op. Br. 42–43.
Presenting only the species background or mortality numbers or even both is no
substitute for assessing the *effects* to the species when those two types of
information are combined. *See id.* at 44. The Service's references to various other
portions of the EIS serve only to confuse the issues and distract from its failure to
discuss the action's "effects and their significance" for sea turtles. 40 C.F.R. §
1502.16 (2019); *see id.* § 1502.15 (2019) ("Verbose descriptions of the affected
environment are themselves no measure of the adequacy of an environmental
impact statement.").

The Service places great weight on a single sentence in the EIS's regulatory
impact review section (not the environmental consequences section) stating, "We
*think* that approximately 80% of thee [sic] current sea turtle mortalities are Kemp's
ridleys, which are endangered, while the other 20% are green sea turtles, which are
threatened." JA389 (emphasis added) (cited by Service Br. 47). However, this
guess at the species breakdown of mortalities, which lacks any factual support, was
included only to estimate the non-use economic value of reducing sea turtle

21

mortality and is untethered to any assessment of ecological impacts. For example, it is only a coarse description of presumed mortality ratios and does not account for how individual sea turtle species would be differentially impacted by the different alternatives considered in the final EIS. *See* Op. Br. 40–42. Even if it were a more robust species-specific mortality estimate grounded in some sort of analysis, that would only be one piece of the effects equation described above. Nowhere does the Service attempt to assess the third, most crucial part of the equation: how estimated mortality affects the species' varying baseline populations. *See id.* at 42–43.

The final EIS states the purpose and need for the TED rule is "to adequately protect, conserve, and recover sea turtle populations listed under the ESA," and "to comply with the ESA's mandate . . . to aid in the protection and recovery of listed sea turtle populations." JA319. Yet without an understanding of how the various alternatives will impact each species and provide for such protection and recovery, it is impossible for the Service to have fulfilled NEPA's obligation that the agency has taken "a 'hard look' at the environmental consequences of its actions, including alternatives to its proposed course," and ensured "that these environmental consequences, and the agency's consideration of them, are disclosed to the public." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (citations omitted). Consequently, this Court should hold that the EIS for the final rule violates NEPA.

B.     The Service's NEPA Violation Is Properly Before this Court.

Despite never raising the issue below, the Service now argues that

Conservation Groups "forfeited their objection" to the Service's NEPA analysis by

failing to raise it during the administrative process. Service Br. 44–46. This

argument has been waived and, in any case, lacks merit.

The Service admits it did not make this forfeiture argument in the district

court. *Id.* at 45. This Court has "authority to reach arguments not presented to the

district court only under exceptional circumstances." *City of New York v. Nat'l

R.R. Passenger Corp.*, 776 F.3d 11, 16 (D.C. Cir. 2015) ("We generally exercise

our discretion, for example, 'in cases involving uncertainty in the law; novel,

important, and recurring questions of federal law; intervening change in the law;

and extraordinary situations with the potential for miscarriages of justice.'"

(quoting *Flynn v. C.I.R.*, 269 F.3d 1064, 1068–69 (D.C. Cir. 2001))). The Service

makes no argument that this case meets the "exceptional circumstances" standard,

nor are such circumstances present, so it has forfeited its forfeiture argument. *See

Feld v. Fireman's Fund Ins. Co.*, 909 F.3d 1186, 1197 (D.C. Cir. 2018).

Even if the Service could pursue its forfeiture argument, it lacks merit. First,

Conservation Groups and other commenters adequately raised the need for a

species-specific effects assessment in their comments. "[A] claimant need not raise

an issue using precise legal formulations, as long as enough clarity is provided that

23

the decision maker understands the issue raised." *Lands Council v. McNair*, 629

F.3d 1070, 1076 (9th Cir. 2010) (citation omitted). Alerting the agency to an issue

in general terms will be enough if the agency has been given "a chance to bring its

expertise to bear to resolve [the] claim." *Native Ecosystems Council v. Dombeck*,

304 F.3d 886, 900 (9th Cir. 2002).

Conservation Groups' NEPA argument is fundamentally that the Service

needed to assess how its action would affect different sea turtle species but failed

to do so. In comments on the proposed rule, Conservation Groups requested that

the Service "conduct a detailed analysis of sea turtle abundance, fishing effort, and

stranding patterns to determine hotspots of sea turtle mortality in the fishery."

JA275–76; *see also* JA277–78 (asking Service to "investigate and promptly enact

appropriate time and area closures for the fishery to protect important sea turtle

habitat and *populations*" based on "habitat hotspots" (emphasis added)). The

Service responded that it agreed such an analysis "would be a valuable exercise,"

but nonetheless declined to conduct it in the final EIS. JA412. That detailed

analysis among species is precisely what Conservation Groups now argue is

lacking. *See* Op. Br. 40–44. In addition, two biologists commented that a "critical

shortcoming" with the draft EIS was that it did not "demonstrate[] whether or how

the expected mortality reduction of 'small' sea turtles will contribute to population

recovery of the sea turtle species and [Distinct Population Segments]," given that

"incidental capture and mortality in these gears differ widely among sea turtle species and [Distinct Population Segments]." JA303–04; *see Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 948 n.12 (D.C. Cir. 2004) ("It is sufficient that an issue was raised by any commenter; the party petitioning for judicial review need not have done so itself."). Consequently, the Service was adequately alerted to the need to assess the effects to different species' populations, even if the comments did not include the "precise legal formulations" in this case. *Lands Council*, 629 F.3d at 1076.

Second, because "the agency bears the primary responsibility to ensure that it complies with NEPA," exhaustion is not required when "an EA's or an EIS' flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 765 (2004). It is obvious that an EIS for an action explicitly designed to conserve particular sea turtle species must assess the impacts to those species. *See* Op. Br. 38–39. There should have been no need for commenters to point out that basic concept to the Service. Consequently, even if Conservation Groups had not sufficiently raised the species-specific issue, such a failure would not preclude the Court from reaching that fundamental NEPA failure.

## CONCLUSION

For the foregoing reasons, the Court should declare that the final TED rule and final EIS violate the APA and NEPA and remand the rule and EIS to the Service to take further action within one year.[9]


Respectfully submitted this 15th day of August, 2023.

/s/ Christopher D. Eaton
Christopher D. Eaton (CADC Bar No. 60490)
Stephen D. Mashuda (CADC Bar No. 60505)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
415-217-2040 Fax
ceaton@earthjustice.org
smashuda@earthjustice.org

*Attorneys for Plaintiffs-Appellants Center for Biological Diversity, Defenders of Wildlife, and Turtle Island Restoration Network*

---

[9] In a footnote, the Service argues that the Court should deny Conservation Groups' request for a one-year remand deadline. Service Br. 52 n.8. While the Service cites to a February 2022 declaration claiming that a new rule would require a longer time period to complete, it fails to acknowledge any work that has been done on this issue since publishing more than two years ago an advance notice of public rulemaking to require TEDs on all skimmer trawl vessels less than 40 feet in length. *See* 86 Fed. Reg. 20,475 (Apr. 20, 2021).

## CERTIFICATE OF COMPLIANCE

In accordance with Circuit Rule 28(a)(1) and Fed. R. App. P. 32(a)(7), the undersigned certifies that the accompanying brief has been prepared using 14-point Times New Roman typeface and is double-spaced (except for headings and footnotes).

The undersigned further certifies that the brief is proportionally spaced and contains 6,488 words, excluding the parts of the brief exempted by Circuit Rule 32(e)(1) and Fed. R. App. P. 32(f).

The undersigned used Word in Microsoft 365 to compute the word count.

Respectfully submitted this 15th day of August, 2023.

*/s/ Christopher D. Eaton*
Christopher D. Eaton (CADC Bar No. 60490)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
ceaton@earthjustice.org

*Attorneys for Plaintiffs-Appellants Center for Biological Diversity, Defenders of Wildlife, and Turtle Island Restoration Network*